**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Theodore Duane McKINNEY, Defendant-Appellant.**

No. 84–2038.

United States Court of Appeals, Fifth Circuit.

April 15, 1985.

---

John E. Ackerman, Houston, Tex., for defendant-appellant.

Daniel K. Hedges, U.S. Atty., Ronald G. Woods, James R. Gough, George A. Kelt, Jr., Susan L. Yarbrough, Asst. U.S. Attys., Mervyn Hamburg, Appellate Section, Vincent L. Gambale, Crim. Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before RANDALL, JOHNSON and GARWOOD, Circuit Judges.

RANDALL, Circuit Judge:

Theodore Duane McKinney was convicted by a jury of various offenses arising out of an abortive attempt to extort $15,000,000 from the Gulf Oil Corporation by threatening to detonate several bombs installed by McKinney's associates at the Cedar Bayou Chemical Plant. McKinney attacks (1) the admission of evidence obtained during allegedly illegal searches; (2) the admission of statements made by McKinney to FBI agents following his arrest; (3) the Government's repudiation of an agreement to refrain from offering evidence of an extrinsic offense allegedly committed by McKinney; (4) the Government's tardy disclosure of *Brady* material; and (5) the district court's midtrial refusal to review the Government's investigation file for additional undisclosed *Brady* material. Finding no reversible error in the proceedings in the district court, we affirm.

## I.

## BACKGROUND

On September 28, 1982, officials of the Gulf Oil Corporation received a letter stating that more than ten explosive devices had been surreptitiously installed at the corporation's Cedar Bayou Chemical Plant. The letter further stated that another unnamed Gulf facility had been similarly sabotaged. The authors of the letter offered to sell to Gulf for $15,000,000 information regarding the location of the bombs and the means with which to safely disarm them. The letter stated that, if Gulf refused the offer, Cedar Bayou would be destroyed and the price for similar information about the second facility would rise to $30,000,000.

The letter stated that Gulf could accept the offer by placing an advertisement in the classified section of the Houston Post naming a person to whom further instructions could be communicated. The letter stated that this person should have a corporate jet at his disposal to deliver $15,000,000 to a point within 1,500 miles of Houston.

Gulf placed an advertisement in the Houston Post in which Bob Quintana, a member of the Gulf security staff, was appointed spokesperson for the corporation. On October 1, 1982, Quintana received three phone calls from one of the extortionists. Quintana was directed to fly to Phoenix, Arizona, with the money, to rent a car, and to drive from Phoenix to a bowling alley in Apache Junction, Arizona. The extortionist told Quintana that he would be contacted at a pay phone there at 4:00 p.m.

In the meantime, Gulf had been in contact with the FBI. While Quintana and FBI agents in Houston prepared for the trip to Phoenix, agents in Arizona focused their investigation around Apache Junction. Agents made arrangements with the phone company to "trap" phone calls made to either of the two pay phones located at the bowling alley. Quintana, who was by now equipped with transmitting and recording devices, did not arrive at the bowling alley until approximately 6:00 p.m. Between 4:00 p.m. and 5:40 p.m., the telephone company trapped nine unanswered phone calls to the bowling alley's two phones. These calls were all placed from pay phones along Apache Trail, a road not far from the bowling alley. The FBI sent agents to surveil the area around Apache Trail.

At 5:54 p.m., Quintana received a call at the bowling alley from one of the extortionists. The extortionist told Quintana to travel to a Chevron station located on Apache Trail. He received another call at the Chevron station at 6:27 p.m. During this call, he was directed to travel to a nearby department store where he would be contacted again at approximately 7:30 p.m. A telephone company trap revealed that the 6:27 call originated at a pay phone located at 150 Apache Trail. At approximately 6:35 p.m., agents observed two men

sitting in a four-wheel drive truck parked near the telephone booth at 150 Apache Trail. The truck remained parked there for approximately ten minutes and then began a circuitous drive at slower-than-normal speeds through the surrounding area. After driving past the pay phone to which Quintana had been directed by the 6:27 call and making two U-turns, but without making any stops, the truck returned to the pay phone at 150 Apache Trail. After about ten minutes, the two men left the truck and walked to the pay phone. One of them entered and placed a call. The other stood outside of the phone booth "with his head up against it." Quintana received a call at the department store immediately after one of the men under surveillance entered the phone booth at 150 Apache Trail. Upon notification of this fact, agents converged on the telephone booth with their guns drawn and ordered the two men to drop to their knees. An agent then picked up the telephone and verified that Quintana was on the other end of the call. At 7:35 p.m., McKinney, who had been standing outside of the phone booth, and Michael Worth, who had been inside placing the call, were formally arrested.

At 7:36 p.m., McKinney received *Miranda* warnings. At 7:46 p.m., he signed a form authorizing a consent search of the four-wheel drive truck in which he and Worth had been observed earlier. At 7:48 p.m., McKinney was again advised of his *Miranda* rights. Although he stated that he understood his rights, he refused to sign a "Waiver of Rights" form. Shortly after 8:00 p.m., McKinney was transported to the FBI office in Phoenix, where he was questioned until he asked to speak with an attorney at about 10:00 p.m. Agents searched the four-wheel drive vehicle at the FBI office and discovered several weapons and other incriminating evidence.

As their investigation continued, FBI agents learned that the extortion plot was conceived and planned in Durango, Colorado. On October 5, 1982, agents obtained a warrant to search the Ezra R, a Colorado mine owned by McKinney, for bomb paraphernalia and "other evidence of a plan to extort money from Gulf Oil Corporation." Various explosive devices were discovered at the Ezra R. McKinney was eventually indicted, along with Worth, John McBride and two others, for his role in the extortion plot. Following suppression hearings, McKinney obtained a severance of his case from that of his codefendants, all of whom eventually pleaded guilty. McKinney had moved to suppress evidence obtained during the consent search of his vehicle following his arrest and evidence obtained during the warranted search of the Ezra R. At trial, he objected to the admission of statements he made at the FBI office following his arrest. The district court denied the motions and overruled his objection.

During the suppression hearing, it became apparent that McKinney and his codefendants were under investigation by Colorado authorities for the theft of gold from a company known as Standard Metals. McKinney's counsel and an assistant United States attorney discussed this extraneous offense, both on and off the record, and reached an agreement either, as the Government recalls, that the Government would not introduce evidence of the Standard Metals theft in its case-in-chief or, as McKinney recalls, that the Government would not introduce evidence of the Standard Metals theft for any purpose during McKinney's trial. Late in its case-in-chief, the Government announced its intention to introduce evidence of the gold theft if McKinney or Worth testified during McKinney's case-in-chief in support of McKinney's defense that he originally became involved in the extortion scheme because of an honest belief that his codefendants were conducting a legitimate investigation and that, once he discovered the true nature of the scheme, his continued participation was coerced by threats against his wife. McKinney immediately moved in limine to prohibit the Government from introducing evidence, for any purpose whatsoever, of the gold theft. Although the district court denied the motion, along with McKinney's motion for a mistrial, McKinney was granted a three-day continuance to allow counsel time to investigate

the Standard Metals theft. Neither McKinney nor Worth testified at trial.

Before trial, McKinney and the Government engaged in extensive discovery. McKinney asked the Government to disclose all exculpatory evidence in its possession to which McKinney was entitled under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), including evidence "which tends ... to impeach or contradict the testimony of any witness whom the government will call at the trial of the cause." The district court ordered the Government to comply with McKinney's *Brady* request. On the eve of trial, the Government decided for the first time that John McBride would be called as a witness. During trial, McKinney filed a motion to prohibit McBride's testimony on the ground that the Government failed to disclose *Brady* material bearing on McBride's credibility. The district court denied the motion, but ordered the Government to again review its files and to disclose all *Brady* material in its possession relating to McBride. The Government disclosed some additional material and again represented that all *Brady* material had been disclosed. A few days later, however, after McBride left the witness stand, the Government disclosed still more material relating to McBride. McKinney moved for immediate dismissal of the indictment for prosecutorial misconduct or, in the alternative, that the district court itself review the Government's investigation file to ensure that all *Brady* material had finally been disclosed. The district court denied both aspects of the motion.

On appeal, McKinney attacks the district court's rulings on the motions to suppress, the motion in limine, the motion to dismiss for prosecutorial misconduct, and the motion for an in camera review of the Government's investigation file. We shall consider the claims in turn.

## II.

### MOTIONS TO SUPPRESS

A. *Search of the Bronco*

McKinney moved to suppress the fruits of the FBI's consent search of his four-wheel drive truck, a Ford Bronco. McKinney consented to the search immediately following his arrest outside of the phone booth on Apache Trail. McKinney claimed in the district court that the arrest was made without probable cause, that McKinney's consent to search the vehicle was tainted by the illegal arrest, and that the search itself was therefore illegal. The district court denied the motion to suppress the fruits of the search for three separate reasons: (1) the arrest was in fact supported by probable cause and McKinney's consent to the search was "valid"; (2) the search was made under exigent circumstances; and (3) "numerous weapons and ammunition were visible in the vehicle, in plain view."

McKinney claims that probable cause for his arrest did not develop until an FBI agent verified that Quintana was on the other end of the telephone call that had been placed from the phone booth on Apache Trail. McKinney argues, however, that the arrest actually occurred five seconds earlier when agents approached the phone booth with guns drawn and ordered McKinney and Worth to their knees. Finally, McKinney claims that, because the arrest was illegal, the search of the Bronco was necessarily tainted "whether based on consent, exigent circumstances or inventory."

■ We reject McKinney's arguments because we are convinced that agents had probable cause to arrest him *before* they discovered that Quintana was on the other end of the telephone call that had been placed from the Apache Trail telephone booth. "Probable cause for arrest is present 'when the facts and circumstances within the knowledge of the arresting officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant in a person of reasonable caution the belief that an offense has been or is being committed.' " *United States v. Maldonado*, 735 F.2d 809, 815 (5th Cir. 1984) (quoting *United States v. Woolery*,

670 F.2d 513, 515 (5th Cir.), *cert. denied*, 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982)). The agents that arrested McKinney knew that (1) he was parked near a telephone booth from which, minutes before, an extortion call had been placed to Quintana; (2) another extortion call was scheduled for 7:30 p.m.; (3) McKinney and his companion drove past the telephone booth to which Quintana had been directed and then drove aimlessly around the surrounding area at casual speeds; (4) they returned to the same phone booth from which the earlier call had been placed; and (5) McKinney and his companion placed a phone call at the same time that Quintana received the 7:30 extortion call. Relying on "factual and practical [considerations] of everyday life," we agree that a person of reasonable caution would have been justified in believing that McKinney and his companion placed the extortion call that Quintana received. *Maldonado*, 735 F.2d at 815. Obviously, therefore, the agents had probable cause to arrest McKinney.

■ McKinney does not attack the district court's finding, which, at any rate, is amply supported by the record, that he voluntarily consented to the search of his vehicle. Because the voluntary consent was not tainted by an illegal arrest, the district court's decision not to suppress the fruits of the search is fully supported by that finding. Accordingly, we need not address the alternative bases for the court's ruling.

B. *Search of the Ezra R*

McKinney claimed in the district court that, although agents searched the Ezra R pursuant to a warrant, the search was illegal because the affidavit supporting the warrant did not "allege sufficient facts to establish probable cause." The district court rejected this claim after construing the affidavit in "a common sense and realistic fashion."

McKinney argues on appeal that the warrant must fail because there is no information in the affidavit from which a neutral and detached magistrate could have determined that bomb paraphernalia or other evidence of the extortion plot might be located at the Ezra R. In other words, the affidavit, to McKinney, does not establish a sufficient nexus between the items to be seized and the place to be searched. *See generally* 1 W. LaFave, *Search and Seizure* § 3.7(d) (1978 & Supp.1985).

■ An affidavit must "'provide[] [the magistrate] with sufficient reliable information from which he could reasonably conclude that the items sought in the warrant were probably at the location sought to be searched.'" *United States v. Marbury*, 732 F.2d 390, 395 (5th Cir.1984) (quoting *United States v. Morris*, 647 F.2d 568, 573 (5th Cir.1981)). On appeal, "we construe the sufficiency of ... [the] affidavit independent of the district court," and we are not limited by the clearly erroneous standard. *United States v. Freeman*, 685 F.2d 942, 948 (5th Cir.1982). Still, like the district court, we owe much deference to the magistrate's determination of probable cause, and we must construe the affidavit in a common sense manner. *See Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

The affidavit recounts in detail the circumstances surrounding the receipt by Gulf of the extortion letter, the trip by Quintana to Arizona, and the arrest of McKinney and Worth at the telephone booth on Apache Trail. The affidavit also recites information connecting the extortion plot to Durango, Colorado, where suspected-extortionists Worth, McKinney, McBride and McBride's wife, Jill Bird, all reside. For example, the affidavit recounts that phone calls were placed from Bird's Houston hotel room to McBride's residence in Colorado on September 29, 1982. In addition, McBride's telephone number and the numbers of several Durango, Colorado, pay phones were listed on a document entitled "To Contact John for Message Relay or Back-Up Assistance" which was found in Worth's possession on the night of his arrest. The affidavit also states that bombs discovered at Cedar Bayou contained components marketed by Radio

Shack and that the manager of the Radio Shack in Durango, Colorado, sold similar components in September to "M. Worth" and "J. Bird." Moreover, the affidavit recites that on October 4, 1982, McBride confessed to having manufactured the bombs discovered at Cedar Bayou and stated that "Ted McKinney had provided water gell explosive[s] and dynamite included in the devices." Finally, the affidavit states that McKinney owns the Ezra R mine in Silverton, Colorado, and that visual surveillance of the mine revealed three padlocked buildings on the property.

■ McKinney complains that mere evidence of his involvement in the extortion plot and his ownership of the Ezra R does not establish a nexus between the Ezra R and evidence of the extortion plot. Yet, McKinney argues, the affidavit provides nothing further from which a magistrate could have concluded that evidence of the plot might be located at the mine. McKinney relies on *United States v. Flanagan*, 423 F.2d 745 (5th Cir.1970), and *United States v. Gramlich*, 551 F.2d 1359 (5th Cir.), *cert. denied*, 434 U.S. 866, 98 S.Ct. 201, 54 L.Ed.2d 141 (1977), which hold that probable cause to search a residence does not necessarily exist simply because the owner of the residence is known to have been engaged in criminal activity. From these cases, McKinney apparently concludes that, in order to establish a sufficient nexus between the items to be seized and the place to be searched, the affiant, or a reliable person upon whom he has relied, must have seen the evidence there.

■ That, of course, is not the law. A nexus between the place to be searched and the items to be seized may be established *either* through direct observation *or* through "normal inferences as to where the articles sought would be located." *United States v. Minis*, 666 F.2d 134, 139 (5th Cir.), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982). *See also United States v. Freeman*, 685 F.2d at 949 ("[p]assports, personal identification, and bank records are precisely the sorts of items which people tend to keep at home

among their personal papers and effects"); *United States v. Maestas*, 546 F.2d 1177, 1180 (5th Cir.1977) ("Mail is one of those items that people normally receive and keep at their places of residence."). In determining whether a magistrate has drawn a "normal inference" that evidence, fruits or instrumentalities of crime might be found at a given location, we have considered both the distance between the criminal activity or the situs of the arrest and the premises to be searched and the nature of the criminal activity. In *Flanagan*, for example, we held that an affidavit that stated simply that a known felon, who was arrested in Dallas, was carrying items stolen from a home in Houston, did not establish probable cause to search the arrestee's home in Fort Worth. We said: "The statement, even if reliable, that a named person who is a known felon has committed a burglary, plus possession by the suspect of some of the proceeds when arrested, does not without more authorize the issuance of a warrant to search the residence of the accused miles away." 423 F.2d at 747. *See also United States v. Green*, 634 F.2d 222 (5th Cir.1981) (rejecting inference that fruits of crime committed in California might be found in Florida residence of putative criminal). Where there is evidence of "continuing criminal activity," on the other hand, it may be easier to infer that fruits, evidence, or instrumentalities of that activity are located at premises owned by a participant in the criminal operations. *See Freeman*, 685 F.2d at 950.

■ To agree with the magistrate's determination of probable cause, we need only find that the "facts and circumstances described in the affidavit would warrant [acceptance by] a man of reasonable caution" of the inference that bomb paraphernalia or other evidence of the extortion plot could be found at the Ezra R. *United States v. Maestas*, 546 F.2d at 1180. Surely, the affidavit establishes probable cause to believe that McKinney was involved in the extortion plot, that the scheme was centered in Colorado, that some of the components of the bombs were purchased in

Colorado, and that McKinney supplied explosive devices used to manufacture the bombs. Moreover, the affidavit clearly establishes that there are structures suitable for the storage of explosive devices located at the Ezra R. Just as it is reasonable to infer that certain types of materials may be stored in one's home, common sense tells us that it is reasonable to infer that explosive devices may be stored in padlocked storage sheds located at a mine. Given the clear nexus, established by firsthand observations of FBI agents, between McKinney and the extortion scheme, we believe that this inference creates a sufficient nexus between the Ezra R and the items sought by the warrant.

### C. *Postarrest Statements*

At trial, the Government asked FBI agent Bagley to "explain in chronological order [the] conversations [he] had with Mr. McKinney from the time of arrest going on." McKinney objected to the question on the ground that McKinney's postarrest statements were obtained in violation of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

Following McKinney's objection, the district court listened to Bagley's testimony outside of the jury's presence. Bagley's testimony can be summarized as follows. Bagley advised McKinney of his rights immediately following his arrest. A few moments later, McKinney read and signed a form giving his consent to a search of the Bronco. A few moments after that, agents again read McKinney his rights and asked him to sign a "Waiver of Rights" form. McKinney stated that he understood his rights, but that he did not wish to sign the form. Agents then transported McKinney to the FBI office. Once there, McKinney had further conversations with FBI agents. First, he asked the agents to explain the charges upon which he had been arrested. He then stated that the purpose of his trip to Arizona was dove hunting and that he was not involved in the Gulf extortion plot. The district court overruled the objection on the ground that the mere refusal to sign a waiver of rights form does not by itself invoke the right to have counsel present during questioning. Apparently because McKinney did nothing else to indicate a desire to speak with an attorney, the court concluded that the protections of *Edwards* were not implicated. Bagley then repeated the same basic story for the jury.

McKinney argues on appeal that, by refusing to sign the "Waiver of Rights" form, McKinney, in effect, affirmatively "expressed his desire to deal with police only through counsel," *Edwards*, 451 U.S. at 485, 101 S.Ct. at 1885, or at least equivocated with respect to his desire to consult an attorney before speaking to agents. Thus, under *Edwards* or *United States v. Cherry*, 733 F.2d 1124 (5th Cir.1984), all statements made by McKinney at the FBI office on the night of his arrest are inadmissible because agents did not clarify whether McKinney desired to speak with a lawyer, because McKinney did not initiate the conversations, and because counsel had not been made available to him.

McKinney did not expressly ask to speak with a lawyer until 10:00 p.m. on the evening of his arrest, at which point agents immediately stopped questioning him. Apart from the waiver-of-rights form, McKinney does not argue that, prior to the 10:00 p.m. statement, he expressly requested a lawyer or in any other manner, either equivocally or unequivocally, manifested a desire to have legal representation. In fact, there is nothing in the record, beyond the refusal to sign the waiver form, to vitiate the district court's implicit conclusion that McKinney voluntarily spoke with FBI agents and waived his *Miranda* rights. Thus, McKinney's theory that his statements were made in violation of *Edwards* or *Cherry* has merit only if the refusal to sign a waiver of rights form by itself is at least an equivocal invocation of the right to have counsel present during questioning. If the refusal to sign the form is an "equivocal request for counsel," further questioning by police " 'must be limited to clarifying that request.' " *Cherry*, 733 F.2d at 1130–31 (quoting *Thompson v. Wain-*

*wright,* 601 F.2d 768, 771–72 (5th Cir. 1979)).

McKinney candidly points out that we have already rejected the claim that an accused's refusal to sign a waiver form by itself amounts to an invocation of the right to remain silent, thus rendering the fruits of subsequent questioning inadmissible. In *United States v. Klein,* 592 F.2d 909 (5th Cir.1979), the accused was twice advised of his rights and testified that he fully understood that he was not obligated to answer questions. He in fact answered questions, however, and did not ask for an attorney or ask that the interrogation cease. We rejected the argument that the accused's refusal to sign a waiver form, together with his statement that he did "not particularly" want to tell police where he obtained cocaine discovered in his possession, constituted an invocation of his right to remain silent. We said: "Of course, the mere refusal to sign a waiver form does not make further inquiry illegal." *Id.* at 914 n. 10.

McKinney asks us to reconsider *Klein.* McKinney fails to point out, however, that *Klein* is not the only case to reject a per se rule with respect to statements made following the refusal by an accused to sign a waiver form. *See, e.g., McDonald v. Lucas,* 677 F.2d 518, 520 (5th Cir.1982); *United States v. McDaniel,* 463 F.2d 129, 135–36 (5th Cir.1972), *cert. denied,* 413 U.S. 919, 93 S.Ct. 3046, 37 L.Ed.2d 1041 (1973). Moreover, as the Supreme Court noted in *North Carolina v. Butler,* 441 U.S. 369, 375 n. 5, 99 S.Ct. 1755, 1758 n. 5, 60 L.Ed.2d 286 (1979), "[t]he Courts of Appeals have unanimously rejected the ... argument that refusal to sign a waiver form precludes a finding of waiver." In *Butler,* the accused stated that he understood his rights but that he did not desire to sign a waiver form. The Court rejected a per se rule formulated by the Supreme Court of North Carolina that a waiver of *Miranda* rights must be express.

■ As *Butler* makes clear, McKinney seeks to unduly narrow the inquiry. The crucial question is not whether McKinney signed the waiver form and expressly waived his *Miranda* rights. "Rather, the crucial question is when can a waiver of rights be implied or inferred from the actions and words of the person interrogated." *McDonald,* 677 F.2d at 520. McKinney correctly points out that such a waiver cannot be found, even though the accused answered additional questions, if he has made an equivocal request for counsel. *See Cherry,* 733 F.2d at 1130. In *Cherry,* for example, the accused stated that "Maybe I should talk to an attorney before I make a further statement," and, a few moments later, asked "Why should I not get an attorney?" *Id.*

■ In this case, on the other hand, McKinney relies exclusively on his failure to sign a waiver form. Yet, "[a] refusal to sign a waiver may indicate nothing more than a reluctance to put pen to paper under the circumstance of custody." *McDaniel,* 463 F.2d at 135. *See also Palmes v. Wainwright,* 725 F.2d 1511, 1516 (11th Cir.) (refusing "to turn [the] statement 'I will talk to you without counsel, but I won't sign a written waiver form,' into 'I want an attorney' "), *cert. denied,* —— U.S. ——, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984). Accordingly, we reject McKinney's claim that his refusal to sign a waiver form automatically rendered further questioning illegal. Moreover, in the circumstances of this case, we agree with the district court's implicit determination that McKinney voluntarily waived his *Miranda* rights, notwithstanding his failure to sign the form. *See McDaniel,* 463 F.2d at 135 ("A court must look to all the circumstances of the detention to ascertain whether or not the refusal to sign a waiver was tantamount to a refusal to discuss.").

### III.

### AGREEMENT NOT TO USE EVIDENCE

On October 18, 1983, during redirect examination, the Government asked McBride the following question: "Were there numerous thefts [of gold] ... from Standard

Metals during the years '81 and '82?" McKinney objected to the question and, at a bench conference, informed the district court that the Government had agreed not to introduce evidence of McKinney's alleged involvement in the theft of gold from Standard Metals. The Government responded that it did not intend to develop McKinney's involvement in the gold theft through McBride or otherwise during its case-in-chief. The Government also stated, however, that if McKinney opened the door with evidence during his own case that he initially believed that the Gulf extortion plot was a legitimate, private investigation, the Government would in fact introduce evidence during rebuttal of McKinney's involvement in the theft of gold from Standard Metals.

On October 19, 1983, McKinney repeated his view that the Government had agreed not to introduce evidence of the Standard Metals theft during McKinney's trial. The Government again responded that the agreement was limited to use of the evidence in its case-in-chief and asserted that, if McKinney produced evidence that he believed the Gulf extortion plot to be a legitimate investigation, the Government would introduce evidence of his participation in the Standard Metals theft. The district court concluded that the parties had misunderstood their respective positions but that, because the agreement was not reduced to writing or made in open court, the court could not determine its actual scope. To ensure that McKinney would not be prejudiced by the misunderstanding, however, the court continued the case until October 25 so that McKinney could investigate the gold theft matter.

On October 24, 1983, McKinney filed a motion in limine to "prohibit the government from introducing any evidence whatsoever regarding a theft of metals from Standard Metals in Silverton, Colorado." The next day, the district court denied the motion in limine. The court held that, because the agreement had not been presented to the court in a stipulation or otherwise, the court need not attempt "to fare ... out ... the terms of [the] agreement."

The court also found, however, that "there has been an unfortunate but a reparable misunderstanding" between the parties about the Government's intentions with respect to evidence of the gold theft. Finally, the court found that McKinney had not suffered substantial prejudice as a result of the misunderstanding.

In his appellate brief, McKinney apparently assumes that the record conclusively establishes that the Government in fact agreed to forego all possible uses of the gold theft evidence in McKinney's trial; the brief focuses on the prejudice that McKinney purportedly suffered when the district court released the Government from the agreement. At oral argument, McKinney argued that the scope of the agreement is a question of fact that the district court refused to resolve. Our review of the record reveals that the district court made an implicit finding, which is amply supported by the record, that the Government did not agree to refrain from using the extraneous-offense evidence for any purpose. Moreover, we agree with the district court's determination that McKinney did not suffer substantial prejudice from his misunderstanding with respect to the Government's intentions.

We have previously held that agreements between the Government and a defendant to forego the presentation of otherwise admissible evidence are enforceable: "[W]hen the government and a defendant enter into a pretrial agreement both parties are entitled to rely upon that agreement in preparing their respective cases." *United States v. Jackson*, 621 F.2d 216, 220 (5th Cir.1980). In fact, we have reversed at least two convictions because of the receipt of extraneous-offense evidence that the Government had agreed not to present at trial. *See Jackson*, 621 F.2d at 216 (admission of evidence of extraneous loans and overdrafts in prosecution for making false entries in records of a national bank); *United States v. Scanland*, 495 F.2d 1104 (5th Cir.1974) (admission of evidence of prior attempt to pass counterfeit bill in prosecution for passing counterfeit twenty-dollar

bills). We have also recognized, however, that the district court may, in its discretion, release the parties from pretrial agreements if reasonable notice has been given of the desire to repudiate the agreement and, on balance, the prejudice that will flow from the release is outweighed by the reasons justifying it. Moreover, "[i]f there is no resulting prejudice an appellate court should not reverse a trial court decision to release a party from a pretrial agreement." *Jackson*, 621 F.2d at 220 (citing *United States v. Phillips*, 585 F.2d 745 (5th Cir. 1978) (affirming conviction notwithstanding government's failure to follow pretrial discovery agreement)).

These precedents are not particularly helpful in reviewing McKinney's claim that the district court erred in refusing to enforce his version of the agreement. The parties in these cases did not dispute the existence and scope of the agreements; the only question was whether the district court erred in releasing the Government from its obligation to comply with the agreements. In this case, on the other hand, the parties do not agree on the scope of the agreement. Although our research has revealed prior cases presenting a dispute over the scope of pretrial agreements, these too are not particularly helpful. Each of them involves a pretrial agreement stipulated to on the record and approved by the district court; the reviewing courts simply analyzed the district courts' interpretations of fully disclosed agreements to which the courts had been made privy. *See United States v. Hayes*, 589 F.2d 811, 825–26 (5th Cir.), *cert. denied*, 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979); *United States v. Angelini*, 607 F.2d 1305, 1308 (9th Cir.1979); *United States v. Pomares*, 499 F.2d 1220, 1223 (2d Cir.), *cert. denied*, 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974).

McKinney asks us to delineate the district court's role when, during the middle of trial, a party asserts the existence of a previously undisclosed, oral agreement, the scope of which is disputed by his adversary. The district court in this case seemed to hold that, unless the agreement is written or recited in open court and approved by the district court, the agreement is perforce unenforceable and the district court need not resolve any disputes that may develop with respect to the agreement's scope. The district court did not cite any authority for that proposition. Presumably, the court relied on Rule 1(H) of the Local Rules of the United States District Court for the Southern District of Texas, which provides that agreements among the parties or their attorneys are not enforceable unless communicated to and approved by the court.

Presentation of pretrial agreements to the district court will of course greatly reduce the potential for the kind of misunderstanding that has developed in this case. Moreover, compliance with Rule 1(H) in a criminal case is consistent with the spirit of Rule 17.1, Fed.R.Crim.P., which authorizes pretrial conferences in criminal cases and provides that "[a]t the conclusion of a conference the court shall prepare and file a memorandum of the matters agreed upon." Obviously, reliance upon extrajudicial, oral agreements with one's adversary is a hazardous procedure which we do not encourage. We need not decide, however, whether Rule 1(H) is strictly enforceable according to its terms or whether there are circumstances in a criminal case in which fairness will demand that the district court enforce oral agreements notwithstanding noncompliance with Rule 1(H).

 A stipulation among the parties to a lawsuit is akin to a contract. The parties are bound "only to the terms actually agreed upon." *Rice v. Glad Hands, Inc.*, 750 F.2d 434, 438 (5th Cir.1985). Although the district court stated that, because the agreement was not written or recited in open court, it need not determine what terms were agreed upon by the parties to this case, the court considered all of the evidence of the agreement offered by the parties. The court reviewed those portions of the record in which, according to McKinney, the parties discussed the agreement. Moreover, although the court did

not take their sworn testimony, the court listened to extensive statements from both the United States attorney and McKinney's counsel concerning their respective interpretations of the agreement. The district court concluded from this review that there had simply been a misunderstanding. It is implicit in this conclusion that the parties did not reach the agreement upon which McKinney relies. This finding is not clearly erroneous. The references in the record to the agreement are fleeting and do not vitiate the district court's conclusion. Moreover, it is not the case that one of the attorneys must be telling the truth about the agreement and that the other must be mistaken or must have lied to the district court. If they both understood the agreement as they represented to the district court, and if their respective interpretations were both objectively reasonable, there simply was no agreement for want of mutual assent.

■ At any rate, we agree with the district court that McKinney did not suffer substantial prejudice. Assuming that the agreement existed, and assuming that McKinney can now complain of the district court's denial of his motion in limine, cf. *Luce v. United States*, — U.S. —, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) (denial of motion in limine to prohibit use of prior conviction to impeach cannot be raised on appeal unless defendant testifies), the fact remains that McKinney learned of the repudiation of the agreement before the commencement of the defense's case-in-chief. The district court provided McKinney ample time to investigate the Standard Metals theft. Moreover, the district court indicated that, if evidence of the gold theft was received, the court would consider allowing McKinney to conduct additional cross-examination of witnesses who had already testified. McKinney alleges that he suffered additional prejudice because, had he not relied on the Government's promises, either he would have requested jury voir dire on extraneous offenses and would have discussed the gold theft in his opening statement or he would have requested more extensive voir dire on his right not to testify. We agree with the district court's conclusion that this asserted prejudice is not substantial. We note that the jury was instructed on McKinney's right not to testify and presumably would have been instructed, had the gold theft evidence been admitted, on the proper use of extrinsic-offense evidence.

## IV.

## BRADY ISSUES

### A. *Tardy Disclosure*

On October 24, 1983, near the end of the Government's case-in-chief, McKinney filed a motion to dismiss the indictment for prosecutorial misconduct. The motion recites that, just prior to trial, on September 26, the Government announced full compliance with the district court's *Brady* order, which was entered in response to McKinney's request for, among other things, evidence tending to impeach the credibility of Government witnesses. Yet, the motion continues, the Government knew at that time that McBride would be called as a witness at trial and possessed undisclosed material bearing on McBride's credibility. When McKinney learned of the existence of undisclosed *Brady* material relating to McBride, consisting of an FBI report of interviews with McBride's ex-wife and a "rap" sheet on McBride, he moved on October 13 to prohibit McBride from testifying. The district court denied that motion but ordered the Government to review its file, to turn over to McKinney *Brady* material bearing on McBride's credibility, and to submit for the court's review any material that arguably should be disclosed but about which the Government was unsure. On October 13, the Government in fact disclosed to McKinney approximately forty pages of FBI investigation reports and submitted an additional report to the court for in camera review. On October 14, the court denied McKinney's request to view McBride's presentence investigation report, but allowed him to see that portion of the report relating to McBride's criminal

record. In addition, the court excised a portion of the report submitted for in camera review and disclosed the rest of it to McKinney.

The motion to dismiss further recites that, following the Government's announcement of its intention to introduce evidence of the gold theft, the Government, on October 19, disclosed additional FBI reports to McKinney. These reports relate to the Standard Metals theft and, according to McKinney, also contain information bearing on McBride's credibility. Yet, the motion continues, the Government did not release them to McKinney until after McBride testified. Moreover, the motion asserts, the documents released on October 19 reveal that McBride perjured himself during his testimony and that the Government, although in possession of documents that revealed the untruthfulness of McBride's testimony, breached its obligation to point this out to the court. In the motion, McKinney asks the court to dismiss the indictment for prosecutorial misconduct both in failing to alert the court that McBride perjured himself and in disclosing *Brady* material in an untimely manner. In the alternative, the motion asks that the Government be ordered to recall McBride as a witness to afford McKinney an additional opportunity to conduct cross-examination, that McKinney be allowed to interview a witness, at Government expense, whose identity is revealed in the documents disclosed on October 19, and that the court itself review the Government's entire investigation file to ensure compliance with the court's *Brady* orders.

On October 26, the court denied all of the relief requested in the motion to dismiss. First, the court found that the Government did not knowingly employ perjured testimony and that, at any rate, McBride's allegedly false statements were thoroughly impeached during cross-examination. Second, the court found that, although the documents released to McBride on October 13 should have been disclosed as soon as the Government decided that McBride would be called as a witness in its case-in-chief, the tardy disclosure did not rise to the level of

prosecutorial misconduct and, at any rate, did not prejudice McKinney. Third, the court held that, because the Government did not itself obtain the documents released on October 19 until October 17, disclosure of them after McBride testified likewise did not constitute prosecutorial misconduct. Fourth, the court refused to review the Government's investigation file for additional undisclosed *Brady* material because the request was a blanket one that did not point to specific material which may have remained undisclosed. Fifth, the court denied McKinney's request that the Government be ordered to recall McBride for additional cross-examination. The court left open the possibility that, if the Government in fact introduced evidence of the gold theft, McKinney could recall McBride for further cross-examination. Finally, the court noted that the Government had already agreed to provide McKinney with an opportunity to interview the witness whose identity was purportedly revealed by the documents disclosed on October 19.

■ On appeal, McKinney asks us to "send a message" to assistant United States attorneys that *Brady* material must be disclosed *prior* to trial. McKinney fails to recognize, however, that *Brady* does not establish a broad discovery rule; rather, it defines the Government's minimum duty under the due process clause to ensure a fair trial. *See United States v. Campagnuolo*, 592 F.2d 852, 860 (5th Cir.1979). Regardless of our opinion of the Government's conduct in this case, we cannot reverse McKinney's conviction unless a fundamentally unfair trial resulted.

■ There are three elements to a valid *Brady* claim on appeal: "(1) [T]he prosecution must suppress or withhold evidence, (2) which is favorable, and (3) material to the defense." *United States v. Auten*, 632 F.2d 478, 481 (5th Cir.1980) (citations omitted). Even if we assume that the *Brady* evidence at issue in this case was, under the appropriate standard, both favorable and material to McKinney's defense, the fact remains that the Government did not

suppress the evidence. Rather, the Government disclosed it to McKinney during trial. The courts have uniformly held that, in such circumstances, the inquiry is whether the defendant was prejudiced by the tardy disclosure. If the defendant received the material in time to put it to effective use at trial, his conviction should not be reversed simply because it was not disclosed as early as it might have and, indeed, should have been. *See United States v. Nixon*, 634 F.2d 306, 311–13 (5th Cir.) (failure to disclose immunity agreement with Government witness; not disclosed to defendant until witness' testimony), *cert. denied*, 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981); *United States v. Campagnuolo*, 592 F.2d at 860 (even assuming that *Brady* overrides Jencks Act, indictment should not have been dismissed because of tardy disclosure of witness' grand jury testimony containing exculpatory statements); *United States v. Decker*, 543 F.2d 1102, 1105 (5th Cir.1976) (Government fulfilled its disclosure duty by disclosing information to correct false testimony after witness testified but while still subject to recall), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1700, 52 L.Ed.2d 390 (1977); *see also United States v. Xheka*, 704 F.2d 974, 981 (7th Cir.), *cert. denied*, — U.S. ——, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983) (where *Brady* material has impeachment value only, disclosure on day witness testifies satisfies due process), *cert. denied*, — U.S. ——, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984); *United States v. Pollack*, 534 F.2d 964, 973 (D.C.Cir.) ("disclosure by the government must be made at such time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case …"), *cert. denied*, 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976).

■ We agree with the district court's conclusion that McKinney has not shown that he was prejudiced by tardy disclosure of most of the *Brady* material relating to McBride. As noted, McKinney received a group of documents relating to McBride, which the parties have referred to as the "A documents," on October 13. Although direct examination of McBride commenced on October 14, McKinney did not begin his cross-examination until October 18. The record amply supports the district court's conclusion that McKinney used the A documents effectively during cross-examination and thoroughly impeached McBride's credibility. Accordingly, tardy disclosure of the A documents did not impugn the fairness of the trial.

McKinney received another group of documents, which the parties refer to as the "C documents," on October 19. Examination of McBride was completed, however, on October 18. The C documents consist of: (1) an FBI report of an interview with Terry Olliff, an admitted participant in the Standard Metals gold theft; (2) various documents and correspondence allegedly exchanged by McBride under the alias "John M. Muldoon" and his attorney with a company to which gold from the Standard Metals theft was purportedly sold; and (3) two FBI reports of the investigation of the Standard Metals theft. Because McKinney has maintained that evidence of the Standard Metals theft was inadmissible, he has, understandably, not argued generally that his cross-examination of McBride was prejudiced because he did not receive the C documents until after McBride left the witness stand. Rather, McKinney points to two specific items contained in the C documents which purportedly prejudiced the cross-examination of McBride. The FBI report of the interview with Olliff recounts that Olliff stated that "[o]nce John McBride threatened me with death if I told anyone of [the gold theft] and who was involved." The C documents contain a notarized release, signed and sworn to by John Muldoon. In the release, Muldoon purports to release Kinetic Minerals, Inc., from liability in connection with gold concentrate sold to Kinetic Minerals by Muldoon's company. The release states that Muldoon is a general partner of Pacific Mining Partners, a company which had clear title to the gold concentrate sold to Kinetic Minerals. McKinney claims that

the gold referred to in the release was stolen from Standard Metals, that McBride signed the release using his Muldoon alias, and that, because the release is notarized and contains false statements, it constitutes an example of perjury by McBride.

McKinney cross-examined McBride at length about his propensity to commit perjury and to threaten people. He claims that his cross-examination was hindered because he was not provided with the C documents, which contain additional evidence of perjury and threats by McBride. Following disclosure of the C documents, McKinney asked the district court to recall McBride so that McKinney could conduct additional cross-examination with the benefit of this information. The district court refused to do this, apparently on the theory that the information contained in the C documents was not relevant unless and until the Government introduced evidence of the Standard Metals theft.

We agree with McKinney, however, that, in the two respects mentioned above, the C documents contain information bearing generally on McBride's credibility. Moreover, because the information was not disclosed until after McBride testified and because the district court apparently conditioned additional cross-examination on the development during rebuttal of evidence of the Standard Metals theft, McKinney effectively received this information at a point at which it was too late to do him any good at trial.

 The conclusion that this material was effectively suppressed, however, does not end our inquiry. We can reverse McKinney's conviction on this ground only if the evidence was material in a constitutional sense. Assuming that this evidence was specifically requested by McKinney, we must reverse if the evidence "might have affected the outcome of the trial." *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976). Because there is substantial evidence supporting McKinney's conviction which in no way depends on the credibility of McBride and because McBride's credibility was ef-

fectively impeached by thorough cross-examination in which McBride's propensity to lie and to threaten people was fully explored, we are confident that utilization of the C documents during cross-examination would not have affected the outcome of this case. This conclusion also disposes of McKinney's claim that the Government knowingly allowed McBride to present perjured testimony. *See Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397 ("conviction obtained by the knowing use of perjured testimony ... must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury").

### B. *Refusal to Review In Camera the Government's File*

McKinney claims that, following the disclosure of *Brady* material on October 19, the district court should have, upon his request, conducted an in camera review of the Government's entire investigation file. Although the court had previously reviewed specific documents from the Government's file, the court refused to undertake the blanket review requested by McKinney.

McKinney's argument is based entirely upon *United States v. Gaston*, 608 F.2d 607 (5th Cir.1979). In *Gaston*, the defendant sought disclosure of FBI reports of interviews conducted with Government witnesses. The Government acknowledged the existence of two such reports but maintained that they were not discoverable under either *Brady* or the Jencks Act. The district court refused to review the reports in camera and also refused to have them placed in the record for possible review on appeal. We held that, because the Government refused to produce documents that had been specifically requested not just for impeachment, but for possible substantive use, the district court erred in refusing to review them in camera.

McKinney asks us to extend *Gaston* and to hold that, at least where there has been a record of tardy *Brady* disclosures, the

district court must, upon request, review the Government's entire investigation file.

We refuse to extend *Gaston* to that extreme. *Gaston* and the similar case of *United States v. Diaz-Munoz*, 632 F.2d 1330 (5th Cir.1980), involve the district court's refusal to review specific documents, the existence of which were acknowledged, for potentially exculpatory evidence. In this case, on the other hand, McKinney does not point to specific documents that may contain exculpatory evidence. Rather, he claims that the Government's tardy disclosure of some *Brady* documents justifies imposing upon the court the obligation to conduct an exploratory search through the Government's files for additional material. Although we do not condone tardy *Brady* disclosures, we cannot agree with McKinney that the Government's conduct in this case warranted such a procedure.

## V.

## CONCLUSION

For the reasons set forth above, McKinney's convictions are AFFIRMED.