**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Henry Gregory JACKSON,
Defendant-Appellant.**

**No. 79–5385.**

United States Court of Appeals,
Fifth Circuit.

July 11, 1980.

Robert G. Kendall, Mobile, Ala., for defendant-appellant.

Wm. A. Kimbrough, Jr., U.S. Atty., William R. Favre, Jr., Asst. U.S. Atty., Mobile, Ala., for plaintiff-appellee.

Before SIMPSON, HILL and HATCHETT, Circuit Judges.

SIMPSON, Circuit Judge:

Appellant Jackson was convicted in a jury trial of making false entries in the books and records of Eastern Shore National Bank in violation of 18 U.S.C. § 1005. His appeal offers four grounds for reversal: (1) that the district court improperly excluded relevant testimony on hearsay grounds; (2) that the district court improperly admitted evidence of similar acts in violation of the Omnibus Report agreement; (3) that the evidence was insufficient to support the jury verdict; and (4) that the district court erred by refusing to charge the jury as requested. We find merit in the first two grounds and reverse and remand for a new trial.

The three central characters in this episode of high finance are Lowell Harrelson, John C. Chandler, Jr., and appellant Jackson. The setting is the small town of Daphne, Baldwin County, Alabama. The main commercial entities involved are Ball Co Contractors, Baldwin Industries, and Eastern Shore National Bank. Harrelson substantially owns and controls Ball Co and Baldwin Industries. From the spring of 1974 until January of 1976 Jackson was employed as president of Baldwin Industries. Chandler served as chairman of the Baldwin Industries board of directors during the same approximate time period. Chandler had substantial investments in both companies.

In the spring of 1976 Jackson was hired as the president of Eastern Shore National Bank (the bank), a small relatively new bank of only six or seven employees. Ball Co was experiencing cash flow difficulties at this time; consequently the company was in dire need of short term financing. Harrelson turned to Jackson, in his new role as bank president, to satisfy Ball Co's financial needs. On April 30, 1976 Jackson approved a $200,000 loan to Ball Co. Subsequently several of the directors objected to the loan or any future loans to Harrelson or the entities he controlled. One of the directors testified that Jackson was told to get the loan out of the bank and not to do business with Harrelson or his companies.

Nevertheless, in the ensuing three months Jackson approved six loans which either directly or indirectly went to Ball Co. These six loans were the basis of the seven count indictment charging Jackson with making false entries in the records of the bank.

The first loan was to John Chandler for $75,000. The alleged false entry was a notation entered by Jackson on a loan memo indicating that the purpose of the loan was "to move a loan from Mr. Chandler's bank in Kentucky." Government Exhibit 6. The government's theory was that the notation was false because the real purpose of the loan was to aid Ball Co. In fact when Chandler received the loan check from the bank, he immediately endorsed it over to Ball Co. Jackson admitted he knew the loan would *eventually* benefit Ball Co. However, he contended that Harrelson had told him that Chandler intended to use the loan money to move loans from his Kentucky bank so that he could then endorse a loan from the Kentucky bank to Ball Co.

The remaining six counts concerned five loans in varying amounts from $75,000 to $200,000 made directly to Ball Co and approved by Jackson. The bank's procedure before and during Jackson's tenure as president was to submit a list of all loans in excess of $2,500 to the Loan and Discount Committee. The committee was composed of selected members of the bank's board of directors. The bank president was responsible for preparation of the list, but his secretary physically prepared it. The government's theory was that the loan lists submitted by Jackson at the July 13 and September 14 meetings were false because the Ball Co loans were not reported. Jackson argued that loans paid before the meeting of the committee were not required to be reported. The Ball Co loans were short term loans and, with one possible exception, were made and paid in the interim periods between meetings of the committee. Therefore, Jackson argued, the loans were not required to be reported and the loan lists were not false. The secretary who prepared the lists testified that it was the

bank's policy before and after Jackson's appointment to exclude loans paid before the meeting of the Loan and Discount Committee. Several members of the bank's board testified to the contrary.

Of the six counts concerning the loans made directly to Ball Co, Jackson was convicted on count seven only. There was only one apparent material evidentiary difference between count seven and the other counts involving Ball Co loans. The uncontroverted evidence concerning counts two through six was that the loan was either paid before the committee met or that the loan was made after the list was prepared but before the committee meeting. There was conflicting evidence as to whether the count seven loan was paid before the committee meeting, and apparently the jury found that the loan was paid after the meeting.

■ Section 1005, Title 18 of the United States Code makes it a criminal offense for a bank officer to, without authority, make "any false entry in any book, report or statement [of certain banks] with intent to injure or defraud such bank . . . ." The purpose of the statute is to help insure that inspection of a bank's books will yield a true picture of the bank's condition. *United States v. Manderson*, 511 F.2d 179, 180–81 (5th Cir. 1975). The section is limited to false entries and does not cover other criminal breaches of duty. *Id.* The government establishes a violation of section 1005 by proving beyond a reasonable doubt that: (1) the entry is false; (2) the defendant either personally made the entry or caused it to be made; (3) the defendant knew the entry was false when he made it; and (4) the defendant intended that the entry injure or deceive the bank officers or public officers. 18 U.S.C. § 1005; *Brickey v. United States*, 123 F.2d 341 (8th Cir. 1941). The last two issues were hotly contested at trial. An omission of material information as well as an actual misstatement qualifies as a false entry under the statute. *United States v. Krepps*, 605 F.2d 101, 109 (3d Cir. 1979). *See United States v. Foster*, 566 F.2d 1045, 1052 (6th Cir. 1977) *cert. denied* 435 U.S.

917, 98 S.Ct. 1473, 55 L.Ed.2d 509 (implying that an omission may qualify as a false entry).

■ As stated above, Jackson's primary defense to the Chandler loan count was that the notation made on the loan memo was not made with knowledge of its falsity because Harrelson told Jackson that was the purpose of the loan. Jackson attempted to testify to this conversation at trial, but the district judge excluded the proffered testimony on hearsay grounds. A material element of a charge of making a false entry is knowledge of the entry's falsity. Rule 801 of the Federal Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." If Jackson thought the purpose of the loan was to move a loan then he lacked knowledge of the falsity of the entry and is not guilty of making a false entry concerning the Chandler loan. It matters not whether the alleged statement made by Harrelson to Jackson was true or false. It was not offered for its truth; it was offered to establish what Jackson *thought* was the purpose of the loan. The district court improperly excluded the testimony.

As a part of pretrial proceedings the attorneys and defendant Jackson were ordered to appear before a United States magistrate for an Omnibus hearing. The hearing was held March 1, 1979. In the hearing report the government agreed that it would not, unless subsequent developments disclosed, "rely on prior or subsequent acts or convictions of a similar nature for proof of knowledge or intent, motive, scheme, identity, design, plan, [or] res gestae." Record, Vol. 1 at 13. The Omnibus Hearing report was signed and agreed to by the government, defendant Jackson and Jackson's attorney. On March 17, 1979 the district judge adopted the report as "binding on all parties." Record, Vol. 1 at 28.

Nevertheless, the district judge admitted a great deal of evidence of "similar acts." The evidence falls into three categories. The first concerns loans made to Ball Co as

much as sixteen months after the loans involved in the indictment. The second category concerns overdrafts on certain accounts of Harrelson or his companies which were authorized by Jackson. The third category concerns a loan made by the bank to Walter Johnsey at the same approximate time and under similar circumstances as the Chandler loan. The defense counsel's timely objection claimed that admission of this evidence violated the Omnibus Report agreement and that the defense was not prepared to defend against or offer evidence of transactions not covered in the indictment. The objection was overruled for the following reasons:

In his opening statement defense counsel argued that the bank had suffered no loss as a result of any of the loans involved in the indictment. The evidence tended to show a series of short term loans each of which was satisfied by executing a new loan. Under these circumstances a loss would only show up at the end of the string of loans. Therefore evidence of the subsequent loans was admitted to show that, contrary to the defense counsel's assertions, the bank *had* eventually suffered a loss as a result of the loans involved in the indictment. The presence or absence of a loss sheds light on the question of whether Jackson had the requisite intent to defraud the bank at the time he made the loans. *See United States v. Foshee*, 606 F.2d 111, 113 (5th Cir. 1979). Accordingly, the district court admitted evidence of the subsequent loans to rebut Jackson's claim that the bank had suffered no loss. The evidence concerning overdrafts and the Johnsey loan was also apparently admitted to show intent to defraud.

█ Intent to injure, defraud or deceive is a material element of the offense of making false entries. *Agnew v. United States*, 165 U.S. 36, 17 S.Ct. 235, 41 L.Ed. 624 (1897). Rule 404(b) of the Federal Rules of Evidence as well as the traditional common law of evidence allows admission of evidence of other acts, including other crimes, for the limited purpose of showing knowledge or intent. *United States v.*

*Beechum*, 582 F.2d 898 (5th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472; *Weiss v. United States*, 122 F.2d 675, 688 (5th Cir. 1941), *cert. denied*, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550. We have no quarrel with these basic propositions, and we do not express any opinion as to the propriety of admitting the three categories of evidence as similar acts or offenses. However we do find fault with this casual violation of the Omnibus Report agreement.

█ As this court has stated previously, when the government and a defendant enter into a pretrial agreement both parties are entitled to rely upon that agreement in preparing their respective cases. *United States v. Scanland*, 495 F.2d 1104, 1106 (5th Cir. 1974). However, situations may arise which require that a party be released from a pretrial agreement. District courts have substantial discretion in deciding whether a release is warranted, but that discretion is not unbridled. *Scanland* teaches that "minimal standards of fairness" require a sound two factor analysis of the attempted deviation from the pretrial agreement. The court should inquire whether the defendant has reasonable notice of the breach of the agreement and the court should balance the potential for prejudice against the reason for the release. *Id.* If there is no resulting prejudice an appellate court should not reverse a trial court decision to release a party from a pretrial agreement. *United States v. Phillips*, 585 F.2d 745 (5th Cir. 1978).

█ ' In the instant case the defendant did not know that the government was going to breach the pretrial agreement until the middle of the trial. The district court made no inquiry as to notice despite defense counsel's objection that he was not prepared to meet evidence of acts not covered in the indictment. The district court apparently did not balance this obvious potential for prejudice against the reason for the release. The financial transactions underlying the indictment were complicated as was each facet of the Harrelson-Jackson—Ball Co—bank relationship. Jackson's counsel as-

serts that he relied upon the pretrial agreement and therefore was not prepared to present evidence concerning transactions not charged in the indictment. After studying the record and trying to understand the web of financial dealings disclosed, we must conclude that the defendant was prejudiced by the breach of the Omnibus Report agreement. Under these circumstances the district judge's failure to inquire as to reasonable notice and his failure to balance the potential for prejudice against the reason for the requested release constituted reversible error.

In *Scanland* we stated that "[d]espite the lack of reasonable notice and the potential for prejudice there may be some cases where the reason for the requested release from an agreement set forth in an Omnibus Hearing Report will outweigh all other factors." *Id.* at 1107. For several reasons the instant case is not one of these exceptional situations foreseen by *Scanland*. First, the only possible justification advanced by the district judge was that Jackson's attorney had opened the door to introduction of the evidence of subsequent Ball Co loans by arguing that the bank suffered no loss as a result of the loans underlying the indictment. Even if this were sufficient justification for admission of the subsequent Ball Co loans, it could not justify admission of the evidence concerning overdrafts and the Johnsey loan. Second the record reveals that the district judge did not consider whether the advanced reason "outweigh[ed] all other factors." *Id.* *Scanland* requires "a sound analysis of the attempted deviation [from the Omnibus Agreement]"; no such analysis was made in the instant case. *Id.*

For the reasons stated above Jackson's conviction is reversed and the cause is remanded for a new trial consistent with principles set forth in this opinion.

REVERSED and REMANDED.