UNITED STATES of America, Appellee,

v.

**Armando PADILLA, Appellant.**

UNITED STATES of America, Appellee,

v.

**William CHIPPAS, Appellant.**

UNITED STATES of America, Appellee,

v.

**James PERCHEITTE, Appellant.**

Nos. 87–2434, 87–2435, 87–2457, 88–1937, 88–1996 and 88–1997.

United States Court of Appeals, Eighth Circuit.

Feb. 23, 1989.

374

William E. Taylor, St. Louis, Mo., for Chippas.

Robert Ramsey, Clayton, Mo., for Padilla.

Suzanne Philbrick, Oak Lawn, Ill., for Percheitte.

Mitchell F. Stevens, Asst. U.S. Atty., St. Louis, Mo., for U.S.

Before ARNOLD and JOHN R. GIBSON, Circuit Judges, and ROSENBAUM,* District Judge.

ARNOLD, Circuit Judge.

Armando Padilla, William Chippas, and James Percheitte bring this appeal from their convictions and sentences under the federal narcotics statutes. Each defendant was indicted for distribution of cocaine in violation of 21 U.S.C. § 841(a)(1), and conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. § 846. After a week-long trial, the jury found each of the defendants guilty on both counts of the indictment. We affirm these convictions in all respects.

* The Hon. James M. Rosenbaum, United States District Judge for the District of Minnesota, sitting by designation.

In sentencing the defendants, the District Court gave effect to a jury finding concerning the weight of the cocaine sold by the defendants, and enhanced their sentences under 21 U.S.C. § 841(b)(1)(A). The District Court also added a five-year term of supervised release subsequent to the enhanced sentences imposed on each defendant. We conclude that the District Court erred in failing to make its own findings on an issue material to the enhancement of defendants' sentences, and that the statute authorizing a term of supervised release in place of a special parole term had not taken effect at the time of the defendants' unlawful acts. Accordingly, we vacate the defendants' sentences and remand for resentencing.

### I.

Because the jury found the defendants guilty on all counts, we recount the evidence presented at trial in the light most favorable to the prosecution. This case involves a conspiracy among Padilla, Percheitte, and Chippas to transport five kilograms of cocaine from Florida to St. Louis, where it would be sold for $155,000. The defendants were unaware that their prospective buyer, David Lorino, was a special agent for the Drug Enforcement Administration (DEA). Lorino's testimony subsequently became the central evidence for the prosecution's case.

Agent Lorino testified that he met with John Lett, an old acquaintance of William Chippas, in December 1986 in Miami. Lett had been convicted on federal narcotics charges several years earlier, and was used by the DEA as an informant who knew of individuals smuggling large quantities of cocaine from Colombia into the United States. Lett's function, in this and other cases, was to introduce cocaine traffickers he knew to undercover DEA agents posing as buyers. As of December 1986, Lett had become a Canadian resident, and was allowed into the United States for a specified period through a special arrangement between Canadian authorities, the Immigration and Naturalization Service, and the DEA. Lett received $5,500 in reward money from the DEA, plus air fare and hotel expenses, for his cooperation in this investigation.

According to Agent Lorino, William Chippas had contacted Lett about selling cocaine, and Lett relayed this information to Lorino. Lett then arranged a meeting between Agent Lorino and Chippas on the morning of March 1st, 1987, in a pancake house in Plantation, Florida.

At this meeting, Lett introduced Agent Lorino to Chippas as "Tony Rizzo." In his undercover identity as "Tony Rizzo," Agent Lorino posed as a resident of St. Louis, originally from Staten Island, with ties to the New York heroin trafficking group known as the "Pizza Connection." Agent Lorino told Chippas that he was interested in buying 25 kilograms of cocaine delivered to St. Louis. Chippas responded that he could deliver 89% pure cocaine at $31,000 per kilogram to Lorino in St. Louis. Chippas told Agent Lorino that if Chippas were ever arrested, he would never turn his source in for fear of being killed. Chippas and Agent Lorino agreed that Chippas would fly to St. Louis the day before the transaction to view the purchase money, at which point Chippas would call Florida and arrange to have the cocaine driven to St. Louis. According to Lorino, John Lett remained silent during the negotiation between Chippas and Lorino in the pancake house, and was not involved in the discussion after making the initial introduction.

After the Florida meeting, Agent Lorino and Chippas agreed over the telephone that the deal would involve only 5 kilograms of cocaine for $155,000, since Chippas indicated that his source did not want to send more to St. Louis without viewing the purchase money in Florida. Chippas drove to St. Louis, arriving on March 18, 1987. He told Lorino that he decided not to fly because he needed to drive through Georgia to sell two bales of marijuana to the Ku Klux Klan. Chippas was taken to a room at the Hilton Hotel, where agent Lorino showed him a suitcase containing the agreed amount of $155,000. After viewing the money, Chippas remarked to Lorino

that if he (Lorino) was a police officer, John Lett, Chippas, and Lorino would all be killed. Chippas then went to a pay phone where, in Lorino's presence, he placed a long-distance phone call to a number listed in Chippas's phone book as belong to "James." A few minutes later, Chippas received a return call, and told the caller, "hi, how are you, come on up."

Three days later, on March 21, 1987, Chippas told Lorino that his source had arrived. Chippas described his source as a man named "Jimmy" who worked in the portable toilet business. Chippas then took Lorino to the Henry VIII Hotel, where they met James Percheitte. After consulting with Percheitte, Chippas told Lorino that the cocaine would be delivered in a spare tire at a nearby Shell station once the purchase money was delivered to Percheitte in Room 1097 of the Henry VIII Hotel. After Lorino objected to turning over the money before obtaining the cocaine, a compromise was reached whereby Percheitte would remain inside Room 1097 with the $155,000, while an associate of Lorino's, whose real identity was Detective Sam Simon, stood outside the room.

Chippas then called the Park Terrace Hilton Hotel where Armando Padilla was registered. Chippas and Lorino proceeded to the nearby Shell station, where Armando Padilla drove up soon afterward. Padilla shook hands with Chippas, opened the trunk of his car, took out a spare tire, and placed the spare tire in Lorino's trunk. At this point, Chippas and Padilla were arrested. When Detective Simon, posted outside Room 1097, learned that Chippas and Padilla had been arrested, he and other agents immediately entered the room with a hotel security guard's passkey. Simon then placed Percheitte under arrest.

Chippas and Padilla took the stand in their own defense at trial. Chippas claimed that he was entrapped by John Lett. Chippas testified that Lett owed him money, and promised to repay the debt by supplying Chippas with cocaine to sell to Lorino. Padilla testified that he drove to St. Louis to sell his automobile to John Lett, that he knew nothing about a cocaine transaction, and that he was unaware that the spare tire of his car contained cocaine.

## II.

On appeal, Chippas urges us to reverse his conviction because the government failed to produce John Lett as a witness. Chippas's defense theory was that Lett, a paid government agent, entrapped him by initiating the deal with Lorino, and supplying the cocaine which Chippas sold to Lorino. According to Chippas, Lett was the major player in the sale, while Chippas participated only as Lett's stand-in, acting on Lett's instructions. The government failed to produce Lett for deposition in response to Chippas's pre-trial discovery motions, and Lett was not present at the trial. Chippas claims that Lett's absence denied him a fair trial, a conclusion the District Court rejected in denying Chippas's various motions to compel production, for a judgment of acquittal, and for a new trial.

Chippas derives his argument for reversal from the principle defined in *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), that "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege [of confidential information] must give way." *Id.* at 60–61, 77 S.Ct. 627–28. Our Court has applied *Roviaro* to impose a duty on the government "to make every reasonable effort to have [an informant shown to be a material witness] made available to the defendant to interview or use as a witness ..." *United States v. Barnes*, 486 F.2d 776, 779–80 (8th Cir.1973). In this case, of course, Chippas has known the identity of the government informant all along—he has known Lett for over twenty years. Normally, Chippas's power to subpoena Lett under Fed.R. Crim.P. 17 would make any further effort on the government's part unnecessary. Here, however, special problems associated with locating and protecting informants arise. It is doubtful from the record whether Chippas could have located Lett

directly for service of a subpoena.[1] Furthermore, even if Chippas could have obtained Lett's address, it appears from the record that Lett is a Canadian subject, for whom a subpoena issued under Fed.R.Crim.P. 17(e)(2) would have no force. See 28 U.S.C. § 1783; Wright, *Federal Practice and Procedure*, (Criminal) § 277. Under the circumstances, Chippas clearly lacked the power to bring John Lett into court.

■ It appears from the record that the government had this power. Agent Lorino testified at the suppression hearing that Lett had served as informant on other occasions, that Lorino was the principal American government agent in charge of Lett's activities as confidential informant, and that Lorino could quickly find Lett in Canada "if need be." Suppression Hearing at 25. Although this admission does not require the conclusion that Lorino could compel Lett's attendance at trial, it undermines the government's assertion that it employed "every reasonable effort" to make Lett available to the defense. We have approved the Ninth Circuit's approach to this problem in a similar case.

> If [a frequently used informant] is available for hire, he should be available to come and testify.... And since the Government chooses to utilize such agents, with the attendant risk of entrapment, it is fair to require the Government which uses this inherently dangerous procedure to take appropriate precautions to insure that no innocent man should be punished.

*Velarde–Villarreal v. United States*, 354 F.2d 9, 13 (9th Cir.1965), quoted in *Barnes*,

486 F.2d at 780. If Lett had information which might have exculpated Chippas, the government's failure to produce him in these circumstances would be grounds for reversal.

■ On this record, however, we see no reasonable probability that Lett's presence at trial could have produced a different verdict. Unlike the informants in *Roviaro* and *Barnes*, Lett was not alone with Chippas when the criminal transaction was initially arranged, and was not present at all during the subsequent events for which Chippas was convicted. Agent Lorino, and not Lett, was the undercover officer who negotiated and executed the deal with Chippas, and Chippas had a full opportunity to cross-examine Lorino about his informant's criminal history and the extent of Lett's participation in the transaction. Chippas was also allowed to tell the jury his own account of Lett's involvement without restriction. The sheer implausibility of Chippas's story—that Lett would supply $155,000 worth of his own cocaine to Chippas, and then maliciously arrange for Chippas to sell the cocaine to someone Lett knew to be a DEA agent—leaves us without a sufficient reason to require Lett to undergo the considerable risk of attending trial. Because Lett's absence does not "undermine[ ] confidence in the outcome of the trial," we cannot reverse Chippas's conviction on this ground. *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985).

■ Chippas argues, in the alternative, that the District Court abused its discretion by refusing to give the jury Chippas's proposed "missing witness" instruction.[2] This

---

1. Government informers are often difficult to find, since they are seldom "pillars of stability in their communities," and are commonly understood to be "narcotic addicts or petty criminals whose cooperation with law enforcement officers is not entirely voluntary." *Barnes, supra*, 486 F.2d at 780 n. 6 (quoting *United States v. Cimino*, 321 F.2d 509, 514 (2d Cir.1963) (Waterman, J., dissenting)). Whether or not this description applies to Lett, the evidence in this case suggests another very different reason why informants like Lett often *should* be difficult for defendants to contact directly. According to Agent Lorino, Chippas said that if the transaction turned out to be an undercover po-

lice operation, the cocaine supplier would murder John Lett (along with Lorino and Chippas himself). In these circumstances, the government had every reason to keep Lett's address confidential.

2. Chippas requested the following instruction:
   Missing Witness Not Equally
   Available to Defendant
   You have heard evidence about a witness who has not been called to testify. The defense has argued that the witness could have given material testimony in this case and that the government was in the best position to produce this witness.

instruction would have invited (though not required) the jury to infer from the prosecution's failure to call Lett that Lett's testimony would have been unfavorable to the government. The government argues that Lett was not under its control, and that the defense had equal access to Lett. As we have discussed, this assertion is doubtful at best. The District Court acted within its discretion in refusing the instruction for a simpler reason. Here, the government's case was not based "solely on approximations giving rise to 'equivocal inferences of guilt as well as innocence' which ... would have required the government to rebut any alternative explanation." *United States v. Anders*, 602 F.2d 823, 826 (8th Cir.1979) (citation omitted). The government's case against Chippas was overwhelming, based on the direct testimony of Lorino and the tape-recordings of relevant conversations and transactions. Lett's testimony would not have added much to the government's case, since, according to Lorino, Lett's role was confined to making the initial introductions. Lett's absence was therefore not the kind of glaring omission from the government's case which would require the "missing witness" instruction. See *id.* Chippas's exotic story that Lett gave Chippas $155,000 worth of cocaine and induced him to sell it did not suffice to make the inferences of guilt in the prosecution's evidence "equivocal"; instead, Chippas's testimony created a straightforward issue of credibility for the jury. Either Lorino or Chippas was telling the truth about the conduct of the undercover operation, and the jury simply chose to believe Lorino. We conclude that Chippas's proposed instruction was not necessary to guide the jury's evaluation of the evidence.

## III.

■ Chippas argues that his indictment should have been dismissed because "the conduct of law enforcement agents [was] so outrageous that due process principles ... absolutely bar the government from invoking judicial process to obtain a conviction ..." in the sense suggested in *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973). Chippas claims, first, that Lett's alleged provision of cocaine created a "full circle" transaction in which the Government sold contraband to itself, involving Chippas only to produce a conviction. This argument simply restates Chippas's entrapment defense in due process terms. The jury, which had been instructed on entrapment, apparently disbelieved Chippas's story that Lett supplied the cocaine. Even if Chippas told the truth about Lett, such government conduct toward a predisposed defendant would not, without more, suffice to create a due process defense. *Cf. Russell, supra.*

■ Chippas further argues that the government designed the drug transaction to create venue for his trial in the Eastern District of Missouri. According to Chippas, it is much more onerous for a Florida resident to stand trial on federal cocaine charges in St. Louis than in Miami, since (he claims) jurors and prosecutors in the Midwest are less indulgent of cocaine violations than their counterparts in Florida. Even assuming that DEA agents lured Chippas to St. Louis for this reason, this does not come close to stating a defense for outrageous police conduct. If it was convenient for Chippas to agree to come to St. Louis to deliver cocaine, it is convenient for him to stand trial in St. Louis on federal cocaine charges.

■ Chippas asserts next that he was selectively pretargeted by the DEA, and that John Lett was paid a fee contingent on Chippas's conviction. Chippas points to no

---

If you find that this uncalled witness could have been called by the government and would have given important new testimony, and that the government was in the best position to call him, but failed to do so, you are permitted, but you are not required, to infer that the testimony of the uncalled witness would have been unfavorable to the government.

In deciding whether to draw an inference that the uncalled witness would have testified unfavorably to the government, you may consider whether the witness' testimony would have merely repeated other testimony and evidence already before you.

evidence supporting this assertion, contending instead that Lett's unavailability, combined with DEA Agent Stoddard's uncertainty concerning Lett's fee, creates an inference that Lett was paid to frame Chippas. This argument is without merit. Agent Lorino, who was the principal agent directing the investigation, testified directly that Lett was paid a flat fee of $5,500, and that Chippas had initiated the contact with Lett. Chippas's failure to persuade the jury that he was entrapped by Lett and Lorino precludes a separate defense on this ground.

▌ Chippas's final claim of outrageous police conduct relies on Agent Stoddard's testimony at the suppression hearing that, after arresting and handcuffing Chippas, Stoddard held a loaded revolver under Chippas's chin and warned Chippas not to carry out any threats against John Lett.[3] This single act subsequent to Chippas's arrest does not establish that the preceding investigation of Chippas was itself so outrageous that Chippas cannot be prosecuted.

### IV.

Each defendant argues that the District Court's admission of various forms of prosecution evidence over defense objection, along with certain allegedly biased comments from the bench, constitute grounds for reversal.

▌ Percheitte argues that his warrantless arrest in Room 1097 was unlawful, and that the evidence seized incident to that arrest should have been suppressed as the fruit of an unlawful search. This evidence included the briefcase containing $155,000 in cash, a one-way plane ticket from Florida to St. Louis, and pieces of paper bearing Chippas's and Padilla's hotel room numbers. It is true, as Percheitte claims, that

the occupant of a hotel room has constitutional protection against warrantless entry. See *Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964).

The government responds that the agents who arrested Percheitte acted under exigent circumstances which justified their warrantless entry and arrest. We agree. In *United States v. Kulcsar*, 586 F.2d 1283 (8th Cir.1978), this Court recognized that the timing of undercover drug transactions makes the simultaneous arrest of all conspirators a matter of special urgency. In *Kulcsar*, a street dealer named Ploof had sold a DEA agent an ounce of cocaine, which Ploof had obtained on credit from Kulcsar, his supplier. After Ploof returned to his supplier's house to turn over the proceeds of the sale, he obtained another ounce and a half of cocaine which the agent had asked to buy. After the second sale, the DEA agent arrested Ploof, and learned the identity of his supplier. DEA agents then proceeded to Kulcsar's house, forcibly entered and arrested Kulcsar. We found that exigent circumstances justified the warrantless entry and arrest:

> Had [the agents] waited the several hours [required] to obtain a warrant, Ploof's failure to return with the proceeds of the second sale could be expected to warn Kulcsar that the sale had gone wrong. Thus the agents faced a significant risk that delay would result in alarming Kulcsar, precipitating removal or destruction of the narcotics or government funds.

586 F.2d at 1287 (citation omitted).

Precisely the same factors operated in this case. Until Chippas's and Padilla's arrest, the conspirators had organized the transaction with a near-paranoid attention to detail. Chippas's subsequent failure to

---

**3.** The District Court prevented Chippas from cross-examining Agent Stoddard on this incident, on the ground that any act of police brutality after Chippas's arrest would be separately actionable under federal civil rights laws. Evidence of police brutality may indicate bias of the police witness against the defendant, see *Blair v. United States*, 401 F.2d 387 (D.C.Cir. 1968), on which the defendant has a Sixth

Amendment right of cross-examination, see *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). In this case, however, Agent Stoddard's testimony was such a minor part of the prosecution's evidence that the District Court's refusal to permit cross-examination on this matter was harmless error. See *id.* at 684, 106 S.Ct. at 1438.

communicate with Percheitte over the time required to obtain a warrant might well have signaled that the deal had gone sour.

▮ Percheitte argues that, since he was unarmed and the DEA had both the door and the window to Room 1097 under guard, there was no attendant risk to such a delay. At the time, however, the DEA agents did not know that Percheitte was unarmed. Chippas's earlier warning to Lorino—namely, that if the deal turned out to be an undercover operation, the supplier would kill them both—would alone have given the agents arresting Percheitte more than reasonable cause for concern. From the perspective of the agents at the time, the risk involved in entering Room 1097 was significantly less immediately after Chippas's and Padilla's arrest than it might have been later. Under the criteria applied in *Kulcsar*, 586 F.2d at 1287, we are satisfied that the agents peaceably entered Room 1097 to arrest a suspect who they had probable cause to believe had committed a grave offense, whom they knew to be in the room, possibly armed, and who might have attempted a violent escape if more time had passed without word from his co-conspirators. Accordingly, Percheitte's arrest did not violate his Fourth Amendment immunity from unreasonable searches and seizures.[4]

▮ Next, all three defendants protest the District Court's admission of Lorino's testimony that Chippas drove through Georgia to deliver two bales of marijuana to the Ku Klux Klan. Insofar as this testimony indicated that Chippas was in the business of selling illegal drugs, it was directly relevant to rebut Chippas's entrapment defense. Under Fed.R.Evid. 404(b), such evidence would be admissible to show Chippas's predisposition to traffic in controlled substances.

The identity of the party with whom Chippas was allegedly dealing, however, was not relevant to any issue at trial. The unnecessary association of the Ku Klux Klan, an infamous organization, with the defendants created a real danger of prejudicing the jury against the defense, with no countervailing probative value for the issues before the jury. The reference to the Ku Klux Klan should have been suppressed under Fed.R.Evid. 403.

▮ The remaining question is whether the reference to the KKK affected the defendants' substantial rights so far that a mistrial was warranted. See *United States v. Dougherty*, 810 F.2d 763, 767 (8th Cir.1987). Here, Lorino referred to the KKK only once, in his testimony on the first day of a trial that lasted seven days. The prosecution did not examine Lorino further concerning the KKK, nor did any related topic come up in later testimony or in closing argument. The cumulative effect of the testimony, in this context, appears small. Furthermore, the evidence of guilt against all three defendants was so overwhelming that it is difficult to imagine a different verdict in a trial in which this single prejudicial remark had been excluded. *Cf. Dougherty*, 810 F.2d at 768. On review of the entire record, we conclude that the District Court's erroneous admission of this prejudicial evidence was harmless beyond a reasonable doubt.

We have considered other alleged errors in the conduct of the trial and hold that they are without merit. Equally insubstantial are Percheitte's claim that his case should have been severed, and Padilla's and Percheitte's argument that the evidence against them was legally insufficient.

## V.

▮ Percheitte and Padilla contest the enhancement of their sentences for possession of five kilograms of cocaine under 21 U.S.C. § 841(b)(1)(A)(ii). According to de-

---

4. Nor did the agents' unannounced entry with a hotel passkey violate the statutory obligation imposed on federal officers to give "notice of [their] authority and purpose" prior to intruding to execute a warrant under 18 U.S.C. § 3109. The exceptions for exigent circumstances in constitutional rules governing searches and ar- rests apply equally to statutes like § 3109 "since [those limited exceptions] existed at common law, of which the statute is a codification." *Sabbath v. United States*, 391 U.S. 585, 591 & n. 8, 88 S.Ct. 1755, 1759 & n. 8, 20 L.Ed.2d 828 (1968).

fendants, the record shows serious irregularities in the weighing and testing of the five separate bags of cocaine discovered in Padilla's tire. In particular, the defendants claim the weights given by a government witness for each of the bags, added together, total less than 5,000 grams of cocaine. Hearing this evidence at trial, the jury nevertheless returned a verdict against the defendants on the indictment, which charged the defendants with conspiracy to possess and distribution of over 5,000 grams of cocaine "[i]n violation of Title 21 U.S.C. Section 841(b)(1)(A)." The defendants argue that this verdict is not supported by substantial evidence.

We do not need to assess the sufficiency of the evidence relating to the weight of the cocaine, because this issue was a matter for the sentencing judge, and not the jury, to resolve. Section 841(b)(1)(A)(ii) does not create a separate offense for violations involving 5 kilograms or more of cocaine. The subsection instead designates "a particular fact relevant to sentencing defendants convicted under the substantive provisions of § 841(a), [and] dictate[s] the enhancement available if the sentencing judge determines the offense so warrants." *United States v. Wood*, 834 F.2d 1382, 1390 (8th Cir.1987). Accordingly, we interpret the defendants' convictions on the charges in the indictment as convictions under § 841(a).[5] It remains for the District Court to determine whether the facts support an enhancement of defendants' sentences under § 841(b)(1)(A)(ii), and so we vacate the defendants' sentences and remand for re-sentencing. The District Court may make its findings on the present record.

## VI.

█ Finally, all of the defendants argue that they were sentenced under the provisions of amendments to § 841(b) which had not taken effect at the time of their offense. Under the provisions of the Narcotics Penalties and Enforcement Act of 1986,

Pub.L. 99–570, 100 Stat. 3207, § 1001 et seq., the District Court enhanced the sentences of each defendant pursuant to § 1002 of the 1986 Act, which amended the penalty provisions of § 841(b)(1), and imposed a five-year term of supervised release under § 1004 of the Act. The defendants claim that the District Court acted without statutory authority in applying both provisions of the Act.

As the government concedes, the District Court's imposition of a term of supervised release was erroneous, because § 1004 of the 1986 Act did not take effect until November 1, 1987, the effective date of 18 U.S.C. § 3583, which announced standards for supervised release. See *United States v. Portillo*, 863 F.2d 25 (8th Cir.1988) (per curiam). The remaining question is whether the other sections of the 1986 Act, including the sentence-enhancement provisions of § 1002, have the same effective date as § 1004. The defendants contend that none of the provisions of the 1986 Act took effect before the date set in § 1004(b), quoting the language of that section:

SEC. 1004. ELIMINATION OF SPECIAL PAROLE TERMS.

(a) The Controlled Substances Act and the Controlled Substances Import and Export Act are amended by striking out "special parole term" each place it appears and inserting "term of supervised release" in lieu thereof.

(b) The amendments made by this section shall take effect on the date of the taking effect of section 3583 of title 18, United States Code.

Here, the defendants read the phrase "amendments made by this section" to refer to all of the amendments to 21 U.S.C. § 841(b)(1) effected by the whole of the 1986 Act. This is an unreasonable interpretation of § 1004(b) of the Act. Defendants offer no explanation for Congress to make the effective date of the entire Act, including provisions unrelated to super-

---

**5.** We reject Padilla's argument that the indictment was insufficient because it erroneously identified the charged offenses as violations of the penalty provisions of § 841(b)(1)(A)(ii) rather than the substantive provisions of § 841(a).

The indictment's incorrect citation of the statute did not prejudice Padilla, and so the prosecution's technical pleading error cannot be grounds for reversal under Fed.R.Crim.P. 7(c)(3).

vised release, depend on the time the federal supervised-release program took effect. If Congress had intended to set a delayed effective date for all of the provisions of the Act, it surely would not have chosen to bury this announcement in a subsection of a relatively minor provision. We conclude that § 1004(b) governs the effective date of § 1004, while the rest of the Act, absent an express provision to the contrary, must be construed as effective on enactment. See *United States v. Meyers*, 847 F.2d 1408, 1414–15 (9th Cir.1988).

On remand, we direct the sentencing judge to apply the special-parole-term provisions of the law as it existed prior to § 1004 of the Act, 21 U.S.C. § 841(c) (1984). In the event that the District Court finds that sentencing enhancement under § 1002 of the Act is warranted, it should impose sentence under the terms of § 841(b)(1) as amended by § 1002 of the Act.

In conclusion, we affirm the convictions of the defendants. We vacate the defendants' sentences, and remand to the District Court for resentencing of the defendants. Since the defendants' crime occurred after October 27, 1986, the date of enactment of the Narcotics Penalties and Enforcement Act, but before the effective date of § 1004 of that Act, all provisions of that Act shall govern the defendants' sentencing, except those of § 1004.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.