**UNITED STATES of America, Appellee,**

v.

**Larry Lester GULLICKSON, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Clark Eugene NELSON, Appellant.**

**Nos. 92–2162, 92–2164.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1992.

Decided Jan. 5, 1993.

Order Denying Rehearing March 5, 1993.

---

Terry L. Hegna, St. Paul, MN, argued for appellant Gullickson.

Thomas H. Shiah, Minneapolis, MN, argued for appellant Nelson.

Margaret T. Burns, Minneapolis, MN, argued for appellee.

Before JOHN R. GIBSON, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Larry Lester Gullickson and Clark Eugene Nelson were convicted of conspiracy to possess marijuana with intent to distribute it, 21 U.S.C. §§ 841(a)(1), 846 (1988), and Nelson was convicted of possessing an unregistered sawed-off shotgun, 26 U.S.C. §§ 5841, 5861(d), 5871 (1988). On appeal, Gullickson argues that there was insufficient evidence to convict him; that he was entitled to a two point reduction under the sentencing guidelines section 3B1.2 because he was a "minimal participant"; and that the district court failed to depart from the guidelines range because it erroneously believed Gullickson's post-conviction conduct could not be the basis for a departure. Nelson argues that the district court erred in imposing consecutive terms of supervised release for his two convictions; that the evidence shows he was entrapped as a matter of law; and that the district court abused its discretion in admitting evidence of Nelson's prior purchases of cocaine. Finally, both Nelson and Gullickson complain that the government breached its pretrial agreement in failing to produce its informant for them to interview until the eve of trial. We reverse and remand for a new trial on the drug charges.

The government caught Nelson and Gullickson in an operation called a "reverse sting," in which government agents sell illegal drugs to persons whom they believe are in the habit of buying such drugs. (Apparently, in an ordinary "sting," the government agent buys, rather than sells, the drugs). Government agents planned the sting after one David Huff was arrested on methamphetamine charges and began cooperating with the government to apprehend drug dealers operating in South-

ern Minnesota. Huff drew up a list of drug dealers he knew, including Nelson. Huff testified that he had sold Nelson cocaine regularly for three years and that he knew Nelson was selling marijuana. As a first step in setting Nelson up, Huff contacted Nelson. Huff testified that in their initial conversation Nelson said he did not want to buy marijuana from Huff because he already had some, but he might buy cocaine. Huff testified that he "kept leadin' [Nelson] on" by telling him that he was waiting for his drug supply to arrive. Nelson called Huff later to pursue the cocaine idea, and at Nelson's request he and Huff had a meeting at the "Office Bar," which Gullickson attended. At the meeting Nelson and Huff discussed a possible cocaine purchase, and Nelson said that he might also be interested in buying ten to twenty pounds of marijuana because his ordinary source of supply was unavailable. After the meeting, Huff called Nelson to say that he had the drugs available to sell and the two later set up a meeting for Nelson to inspect the marijuana and cocaine.

At this point Minnesota Bureau of Criminal Apprehension Agent Tim O'Malley entered the picture. A lawyer and University of Chicago graduate, O'Malley posed as an out-of-town drug dealer who was supplying the drugs for the transaction. O'Malley and Huff met with Nelson at the Mapleview Liquor Store (actually, a bar as well as a liquor store) in Austin, Minnesota on May 10, 1991. Nelson and O'Malley left the bar and got into O'Malley's car to converse privately. At different points in the conversation Nelson told O'Malley that he had been in the marijuana business for six to seven years, twenty years, and five years, variously. Nelson also said that he could sell fifty pounds of marijuana in two weeks. He said he usually bought the marijuana in Texas and that he currently had $15,000 tied up in a transaction there. O'Malley then introduced Special Agent Michael Perry, who was posing as O'Malley's cohort, waiting with the marijuana in a nearby car. Perry got the marijuana out of his trunk for Nelson to inspect. Nelson approved the quality of the marijuana, but left without buying any.

However, Huff and O'Malley called Nelson and the parties set up a second meeting at the same place on May 14 to arrange a marijuana transaction. Nelson outlined his plan for the transaction: He would show up at the Mapleview bar with $13,500, enough money for fifteen pounds of marijuana. Once O'Malley had counted the money, a "friend" whom Nelson would bring to the bar would leave with Huff in O'Malley's car, which would contain the marijuana. The "friend" would drive to Nelson's farm, verify that the marijuana was there, and call Nelson at the bar to let him know everything was fine. Then Nelson could leave and Huff would come back in O'Malley's car to pick up O'Malley.

Huff, O'Malley, Nelson, and Gullickson met at the bar as planned. Nelson gave O'Malley the money, literally under the table. O'Malley asked Gullickson if he was the one who was going to ride with Huff to the farm and Gullickson nodded "yes." O'Malley asked Gullickson how long it would take, and Gullickson said half-an-hour. O'Malley also told Gullickson that the weight of the marijuana in the car might be over the agreed amount and Gullickson should weigh it and send back the excess. Gullickson said that process would take ten minutes more. Nelson and O'Malley went out to O'Malley's car for O'Malley to count the money, and Nelson reiterated that Gullickson was to be the person to verify that the marijuana was there and also to package it for resale. O'Malley and Nelson went back inside the bar and shortly thereafter Nelson and Gullickson were arrested.

Government agents obtained a warrant to search Nelson's farmhouse, and they found scales and plastic bags commonly used in the drug trade. They found a small amount of marijuana scattered around the scales. They also seized the sawed-off shotgun from the house.

## I.

Both Gullickson and Nelson argue that the government breached its pretrial agreement to produce David Huff for interview in advance of the trial.

The government agreed to make Huff available for interview by defense counsel

"within ten days." The magistrate judge referred to this agreement in ruling motions to disclose the identity of informants moot in a pretrial order in July, 1991. Thus, the agreement was given the imprimatur of the court and was the basis for the court denying the requested relief. The government did not produce Huff at the appointed time and, in response to defense counsel's inquiries, stated that Huff was out of state. The prosecutor told defense counsel that Huff would be made available November 8, the Friday before trial; again, Huff failed to appear. At the opening of the trial, defense counsel moved to dismiss the case because the government had failed to produce Huff. The court denied the motion on the grounds that: Huff's identity had been disclosed; Huff was not in the government's custody or control; and the government would make Huff available for interview that very evening—which was the night before the government presented its case. The court concluded that the government had done all it was required to do.

On appeal Nelson and Gullickson argue that Huff's testimony was key to the case against them and the government's failure to produce Huff as agreed kept them from being able to prepare their defenses. Nelson and Gullickson rely on *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), and our cases interpreting *Roviaro, United States v. Barnes*, 486 F.2d 776 (8th Cir.1973), and *United States v. Padilla*, 869 F.2d 372, 376–78 (8th Cir.), *cert. denied*, 492 U.S. 909, 109 S.Ct. 3223, 106 L.Ed.2d 572 (1989). These cases deal with the government's obligation to disclose an informant's identity or produce the informant as a witness. The reasoning in each of these cases hinges on the fact that the informant was not produced before trial and did not appear at trial. *Barnes* expressly distinguished its holding from a case in which the government produces the informant at trial. According to *Barnes*, when the informant testifies at trial the defendant has the opportunity to cross-examine the informant and no prejudice results. 486 F.2d at 779. Therefore, neither *Roviaro* nor our cases interpreting it support the defendants' arguments.

■ But though the government may not have violated the rule of *Roviaro*, it violated its pretrial agreement to produce Huff in July without adequate excuse. When the government seeks to be released from a pretrial agreement, the district court must first consider whether the government provided adequate notice of its breach, and second, whether the government's reason for being unable to perform its agreement outweighs the prejudice to the defendant. *See United States v. Jackson*, 621 F.2d 216, 220 (5th Cir.1980); *United States v. Laboy*, 909 F.2d 581, 586–87 (1st Cir.1990). Though the district court has considerable discretion in releasing the government from its promise, *Jackson*, 621 F.2d at 220, we cannot approve the district court's ruling in this case. The evidence at trial shows that Huff told his government contact that he was leaving the state after the defendants' arrest, and the government agent instructed Huff to "call me at least once a month to tell me where he was." Huff arrived in the area in plenty of time to provide the damning testimony at trial. Though he was not a regular government employee, the government paid him for his part in the reverse sting. Therefore, it is not at all clear from the record that the government was unable to live up to its agreement. Furthermore, Huff's testimony was crucial, particularly to Nelson's entrapment defense, since it was Huff who caused the government to lay a trap for Nelson and he alone who had the initial contacts with Nelson leading to the transaction. Indeed, Huff admitted "one of the reasons [he] first contacted Clark Nelson" (in addition to government business, of course) was to borrow $600 from Nelson to cover bad checks Huff had written and that at some point he told Nelson he would pay him back out of proceeds from the drug transaction. In sum, Huff identified Nelson as a drug suspect; borrowed Nelson's money and then suggested to Nelson that repayment of the money hinged on the successful conclusion of the drug deal, for which Nelson was then prosecuted. Obviously, such a person would be a central figure in Nelson's entrapment defense.

The defendants were prejudiced by the government's failure to produce Huff in time for the defendants to investigate his story and plan their defenses accordingly. We conclude it was an abuse of discretion to permit the government to renege on its agreement, which the court relied on in dismissing the defendant's motion to disclose identity of informant. We reverse for a new trial on the drug charges. Since Nelson does not make his entrapment argument in regard to the firearms offense, we do not disturb that conviction.

## II.

■ Gullickson argues there was insufficient evidence to convict him of conspiracy to distribute marijuana and therefore that the district court should have directed a verdict in his favor. We must review the evidence in the light most favorable to the government, and affirm if there is substantial evidence to support the jury verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Long*, 952 F.2d 1520, 1524–25 (8th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 298, 121 L.Ed.2d 222 (1992).

■ There was ample evidence to convict Gullickson. He accompanied Nelson to one meeting with Huff at the Office Bar and the final meeting at the Mapleview Liquor Store and Bar, and was present at those meetings during discussions about the planned transaction. Before the May 14 meeting, Nelson described a plan that involved a "friend" who would drive the marijuana to Nelson's farm and weigh it. At the May 14 meeting, O'Malley asked Gullickson if Gullickson was the one who was going to ride with Huff to the farm, and later if he would call once he had weighed the marijuana. To both questions, Gullickson nodded "yes." Gullickson also gave estimates on how long it would take to drive out to the farm and to weigh the marijuana. When Nelson and O'Malley talked in private, Nelson said Gullickson's role was to drive the marijuana to the farm and also to package it for resale. The district court did not err in refusing to direct a verdict for Gullickson.

## III.

■ Nelson argues that the district court erred in denying his motion for acquittal on the grounds that Nelson was entrapped as a matter of law. In order to prove the entrapment defense, Nelson must show both: (1) that the government induced him to commit the crime; and (2) that he was not predisposed to commit the crime. *United States v. LaChapelle*, 969 F.2d 632, 635 (8th Cir.1992). There was quite a lot of evidence that Nelson was predisposed to deal in marijuana, most of it being reports of Nelson's own statements. He told O'Malley that he had been dealing in marijuana for five, six to seven, and twenty years, variously. He told O'Malley that he had $15,000 tied up in a marijuana transaction in Texas. Furthermore, at Nelson's house police found scales and plastic bags indicative of drug dealing, together with scattered marijuana, indicating that the scales had been in use. (Since Gullickson and Nelson were arrested before consummating their purchase, the marijuana at the farm was not supplied by the government). Nelson has not by any means proven entrapment as a matter of law.

## IV.

■ In light of our remand for a new trial, it is not necessary that we decide Gullickson and Nelson's evidentiary and sentencing arguments. As the issue may recur, we do address Nelson's argument that he could not be sentenced to consecutive terms of supervised release. As we read the statute, it was impermissible to sentence Nelson to consecutive terms of supervised release. 18 U.S.C. § 3624(e) (1988) states: "The term of supervised release commences on the day the person is released from imprisonment *and runs concurrently with any Federal*, State, or local term of probation or supervised release or parole for another offense to which the person is subject or becomes subject during the term of supervised release." (emphasis added). The government relies on dictum from *United States v. Saunders*, 957 F.2d 1488, 1494 (8th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 256, 121 L.Ed.2d 187 (1992), stating that a district court might

impose consecutive terms of supervised release. Despite some judicial authority to the contrary,[1] we believe the statute unambiguously states that terms of supervised release on multiple convictions are to run concurrently. We are of course bound to follow the plain language of the statute. *See United States v. Jones,* 811 F.2d 444, 447 (8th Cir.1987).

We reverse the drug convictions and remand for a new trial. We affirm Nelson's firearms conviction.

WOLLMAN, Circuit Judge, concurring in part and dissenting in part.

I respectfully dissent from that portion of the court's opinion which holds that the district court abused its discretion in permitting the government to renege on its agreement to produce the informant for an interview within the time specified. Huff's identity was disclosed well in advance of trial, so Nelson and Gullickson had ample time to make whatever investigation they wanted of Huff's background, reputation, and the like. There is nothing in the record to suggest that the government was guilty of bad faith in failing to produce Huff for an interview in advance of trial. Nelson and Gullickson point to no specific prejudice that they suffered as a result of the late production, other than to make conclusory allegations regarding the steps they could have taken to investigate the information contained in Huff's forthcoming testimony. Given the district court's on-the-scene ability to assess the impact of Huff's testimony and the ability of Nelson and Gullickson to counter it through cross-examination and otherwise, I would hold that the district court did not err in refusing to prohibit Huff's testimony as a sanction for the government's failure to make him available for an interview in a timely manner.

I concur in the remainder of the court's opinion.

## ORDER

March 5, 1993.

The motion for release pending issuance of the mandate has been considered by the court and is hereby denied.

Both petitions for rehearing by the panel are denied.

---

1. A number of courts have imposed consecutive terms of supervised release without discussion of the issue. *United States v. Bakhtiari,* 729 F.Supp. 11, 13 n. 1 (S.D.N.Y.1989), *aff'd,* 913 F.2d 1053 (2d Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991); *see also United States v. Torres,* 901 F.2d 205, 248–51 (2d Cir.) (same result without discussion), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *United States v. Gordon,* 901 F.2d 48, 49 (5th Cir.) (same result without discussion), *cert. denied,* 498 U.S. 981, 111 S.Ct. 510, 112 L.Ed.2d 522 (1990). The Tenth Circuit in *United States v. Maxwell,* 966 F.2d 545, 551 (10th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 826, 121 L.Ed.2d 697 (1992), considered the issue and affirmed consecutive terms of supervised release, without citing section 3624(e).