**UNITED STATES of America,**

v.

**Eric C. MARTINSON, a/k/a "Clement B. Potter," a/k/a "Lyle Louden," a/k/a "James F. Corbett," a/k/a "Kenneth E. Helton," a/k/a "Donald J. Monroe," a/k/a "Russell J. Harding," a/k/a "Joseph Steven Rafferty," a/k/a "Derrick A. Walton," a/k/a "Scott Peter Ryan," a/k/a "Amos W. Frye," a/k/a "Howard M. Johnson," a/k/a "Thomas Lee," a/k/a "Lionel K. Lawson," a/k/a "Abe Golden," and Christine M. Dickson, a/k/a "Cheryl K. Nielson," a/k/a "Carol Miller," a/k/a "Christine Martinson," a/k/a "Kristen Ann Lawson," a/k/a "Kristen Ann Corbett," a/k/a "Candice Ann Keiper".**

Crim. Nos. 92–00228–01, 92–00228–02.

United States District Court,
E.D. Pennsylvania.

Jan. 19, 1993.

Karl K. Lunkenheimer, Asst. U.S. Atty., Philadelphia, PA, for the plaintiff.

Emmanuel, Dimetriou, Reading, PA for defendant Martinson.

Stanford Shmukler, Philadelphia, PA, for defendant Dickson.

## OPINION AND ORDER

### VAN ANTWERPEN, District Judge.

Defendant Christine M. Dickson has filed two Motions to Suppress in which defendant Eric C. Martinson joined.[1] The motions rely principally on the extensive Affidavits to the Search Warrants in question, although the Court did, at defendants' request, hold a brief evidentiary hearing on Wednesday, January 6, 1993 to take testimony of three law enforcement officers. Defendant Eric C. Martinson is alleged to be a member of the Warlock Motorcycle Gang. Defendants were both charged with numerous drug and drug related offenses in a major 38-count indictment. On Thursday, January 7, 1993, defendant Christine M. Dickson plead guilty to Counts 1–6, 9, 10, 11, 12, 22, 23, 24, 29, 30, 33, and 35–38. Defendant Eric C. Martinson also entered a conditional plea under Fed.R.Crim.P. 11(a)(2) to Counts 1–6, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, 27, 28, 31, 32, 34, and 35–38. Defendant Martinson reserved the right to pursue the pretrial suppression motions. Before we deal with the motions in detail, we shall discuss the current state of the law of search and seizure.

■ The well-known test to be applied in determining whether probable cause exists for the issuance of a search warrant is that of the "totality of the circumstances." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); *Massachusetts v. Upton,* 466 U.S. 727, 732, 104 S.Ct. 2085, 2087, 80 L.Ed.2d 721 (1984). Probable cause is defined as "a fair probability that contraband or evidence of a crime will be found in a particular place."

*Illinois v. Gates,* 462 U.S. at 238, 103 S.Ct. at 2332; *United States v. Schecter,* 717 F.2d 864, 869 (3d Cir.1983). Moreover, in a landmark case *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court stated:

> Because a Search Warrant "provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime....," we have expressed a strong preference for warrants and declared that "in a doubtful or marginal case, a search under a warrant may be sustainable where without one it would fail" ... reasonable minds frequently may differ of the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according "great deference" to a magistrate's determination. 468 U.S. at 913–14, 104 S.Ct. at 3415–16 (citations omitted).

The Supreme Court then held in *Leon* that when officers obtain and execute a search warrant in the "good faith" belief that the warrant is valid, then the fruits of the search should not be suppressed if the search warrant is later found invalid. *Leon,* 468 U.S. at 918–25, 104 S.Ct. at 3418–21. "[O]ur good faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon,* 468 U.S. at 922 n. 23, 104 S.Ct. at 3420, n. 23. The court in *Leon* went on to note four basic exceptions:

> It is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.
>
> Suppression therefore remains an appropriate remedy if the magistrate or judge

---

1. Defendant Eric C. Martinson asked to do so in his Motion to Join filed October 7, 1992 and we allowed him to do so by Order of January 7, 1993. In the interests of justice, the Court also granted a substantial continuance of the original trial date and extended time for the filing of pretrial motions.

in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Franks v. Delaware,* 438 U.S. 154 [98 S.Ct. 2674, 57 L.Ed.2d 667] (1978). The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319 [99 S.Ct. 2319, 60 L.Ed.2d 920] (1979); in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown v. Illinois,* 422 U.S. [590], at 610–611 [95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975)] (POWELL, J., concurring in part); see *Illinois v. Gates, supra* [462 U.S.], at 263–264 [103 S.Ct., at 2345–2346] (WHITE, J., concurring in judgment). Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient— *i.e.,* in failing to particularize the place to be searched or the things to be seized— that the executing officers cannot reasonably presume it to be valid. Cf. *Massachusetts v. Sheppard, post* [468 U.S. 981], at 988–991 [104 S.Ct. 3424, 3427–3429, 82 L.Ed.2d 737 (1984)].

*Leon,* 468 U.S. at 923, 104 S.Ct. at 3420.

In *Maryland v. Garrison,* 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), the Supreme Court reaffirmed the "good faith" doctrine and held that when officers searched the wrong apartment under a search warrant, the error would not require the suppression of the evidence seized in the search because the officers' actions were objectively reasonable under the facts available to the officers at the time they acted. 480 U.S. at 88, 107 S.Ct. at 1018.

*Leon* has enjoyed wide application. In *United States v. Sager,* 743 F.2d 1261 (8th Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985), the affidavit had certain defects, including stale information and a failure to establish an informant's credibility which made the existence of probable cause doubtful. Nevertheless, the court held that even though the Affidavit to the Search Warrant might be insufficient to establish probable cause, the evidence would not be suppressed. The court found that none of the *Leon* exceptions applied and that the officers "behaved themselves in an objectively reasonably fashion." 743 F.2d at 1267. *See also United States v. Malin,* 908 F.2d 163, 166 (7th Cir.1990); *United States v. Fama,* 758 F.2d 834, 837 (2d Cir.1985); *United States v. Thomas,* 757 F.2d 1359, 1368 (2d Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 67, 88 L.Ed.2d 54 (1985).

## I. ORIGINAL JUNE 5, 1992 MOTION TO SUPPRESS

The original motion to suppress relates to the search of a certain storage locker # 85 at the East Penn Self Storage facility in Emmaus, Pennsylvania.[2] The search warrant is based on the sworn Affidavit of Philadelphia Police Detective Matthew McDonald and, Exhibit C to the Affidavit, the sworn Affidavit of I.R.S. Special Agent Patrick T. Connelly and D.E.A. Deputized Agent Daniel O. Licklider, who is also with the Commonwealth of Pennsylvania. According to the Affidavits, which were presented to the Federal Magistrate on March 24, 1992, Detective McDonald had been investigating Eric Martinson and Christine Dickson since 1989 in regard to defendant Martinson's drug trafficking. (McDonald Affidavit, ¶ 1). A very extensive synopsis of the drug investigation is set forth in Exhibit C, the Connelly–Licklider Affidavit.[3] The synopsis included actual drug transactions, use of false personal identification, a vast continuous pattern of money laundering, warlock motorcycle gang mem-

---

**2.** As a result of the search, illegal firearms, over one-half pound of methamphetamine, money, gold, and silver were found and seized in the storage locker.

**3.** This Affidavit is common to all the search warrants issued in this case, as well as the arrest warrants for both defendants.

bership by defendant Martinson, and the fact that chemical tests and a drug sniffing dog recently reacted positively to cash money deposited in defendants' account. (Connelly–Licklider Affidavit, ¶¶ 23, 84, 144–147, 150).

Beginning on March 18, 1992, Detective McDonald participated in the physical surveillance of Eric Martinson, along with Pennsylvania State Trooper Mark George who is also a Deputized D.E.A. Agent. Trooper George told Detective McDonald that on March 18, 1992, he saw Eric Martinson drive to a storage facility called the East Penn Self Storage facility. Trooper George and other agents reported to Detective McDonald that during a period of approximately one hour and twenty minutes, defendant Martinson drove from his home on Valley Road in Lehigh County, Pennsylvania, to the storage facility and made only two brief stops of less than three minutes each. Throughout the drive, defendant Martinson made irregular turns into side streets, stopped in parking lots, and extended the vehicle to observe traffic in his vicinity. Detective McDonald knew from training and experience that these tactics were utilized by defendant Martinson as counter surveillance to determine if he was being followed. (McDonald Affidavit, ¶ 4).

Upon entering the East Penn Self Storage facility, defendant Martinson drove his vehicle to storage locker # 85. Trooper George observed defendant Martinson enter the locker with a key, remain approximately two minutes, and then drive to the exit of the facility. When he came upon another vehicle, he turned around, went back towards the locker, waited briefly, then again drove to the exit and left alone. (McDonald Affidavit, ¶¶ 5, 6).

Defendant Martinson was then observed driving southbound on Cedar Crest Boulevard, and was seen tossing torn pieces of paper out of his vehicle. Detective McDonald recovered as many pieces as he could and when taped together, the pieces of paper appeared to be two stock certificates for Harvivalous, Inc., a company of which Eric Martinson is the president and Christine Martinson is the secretary.

On his way back, defendant Martinson stopped at the offices of Dean Witter, a stock brokerage, in Allentown, Pennsylvania, where he stayed for more than one hour. He then went through a banking window of Meridian Bank before returning to his residence. (McDonald Affidavit, ¶¶ 7, 8).

Subsequent surveillance and a review of documents showed that defendant Martinson also went to the East Penn Self Storage locker on March 21, 1992 and March 22, 1992. (McDonald Affidavit, ¶ 9). Trooper George also advised Detective McDonald that a review of the records of the East Penn Self Storage locker revealed that locker # 85 is leased by Christine Lawson, a known alias of defendant Christine Dickson, who resides with defendant Martinson. Lawson had rented locker # 85 for the period November, 1991 to June, 1992. (McDonald Affidavit, ¶¶ 9, 10, 11; and Attachments A & C).

Both defendants wove a tangled web whose object was to deceive. The illicit money laundering and related transactions set forth in great detail in the eighty-two pages of the Connelly–Licklider Affidavit are phenomenal both as to dollar amounts and the sheer number of transactions. Such activities had to consume many of the waking hours of both defendants lives. By their very nature, these activities required extensive daily record-keeping. Neither defendant had a job or place of employment (Connelly–Licklider Affidavit, ¶ 138) and it would be logical to expect to find their true records hidden with other evidence at home or wherever the defendants might securely store things. The Connelly–Licklider Affidavit further states an opinion in Paragraph 8 that it is common for money launderers to maintain records of their financial transactions, customers, etc., and that these documents are commonly concealed in secure locations which are hidden from law enforcement authorities.[4]

---

4. As noted, *infra,* opinions such as this are important factors for a reviewing court.

Detective McDonald was familiar with defendant Martinson's drug dealing and related offenses. For anyone to drive in the manner defendant Martinson did would be highly unusual. To the trained eye of a seasoned investigator, such driving could only mean one thing, *i.e.*, defendant Martinson didn't want to be followed to a remote location where there were things pertaining to his illegal activities. This is reinforced by his obvious efforts to avoid being seen leaving the storage locker area. Driving while discarding pieces of stock certificates is also unusual and prohibited by law.[5] We may infer that defendant Martinson took the trouble and risk of littering in this fashion because he did not want the certificates found in his possession. The disposal of the stock certificates and visits to financial offices all took place not before but *after* opening the storage locker. This points to the storage locker as a source of the certificates and other necessary documents. We believe that from these and all the other facts there clearly was a fair probability that both Eric Martinson and Christine Dickson were storing documents or other contraband, or both, in locker # 85 which was related to their criminal activity.

The affiant or other reliable person upon whom the affiant relied does not have to actually see the evidence in a particular place to establish a sufficient nexus between items to be seized and the place to be searched. A nexus may be established by direct observation or by normal inferences. *United States v. McKinney*, 758 F.2d 1036, 1043 (5th Cir.1985); *United States v. Minis*, 666 F.2d 134, 139 (5th Cir.1982), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469. We also believe that none of the *Leon* exceptions to the good faith rule are present and that a reasonably well-trained officer would have believed probable cause was present. There has been no claim or evidence that the magistrate "wholly abandoned" his judicial role, or that the magistrate was misled by information in the warrant affidavit which the affiants knew was false or would

have known was false. Nor can we say that the Affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923, 104 S.Ct. at 3421. The warrant and Affidavit also particularized the place to be searched and the things to be seized. All those involved acted reasonably and with good faith.

Accordingly, defendants' original suppression motion will be denied.

## II. SUPPLEMENTAL OCTOBER 6, 1992 MOTION TO SUPPRESS

Defendants' Supplemental Motion to Suppress concerns the March 20, 1992 search warrant for property, buildings, and vehicles located at defendants' residence at R.D.2 Valley Road, New Tripoli, Pennsylvania; and warrants for storage facilities in Wisconsin and West Virginia; and various postal boxes. Defendants claim that the search warrants for these searches are similar to and improperly rely upon information obtained in the search of storage locker # 85 in Emmaus, Pennsylvania. This is not so because the residence search warrant was issued before the storage locker # 85 warrant. As discussed above, we have upheld the storage locker # 85 search and there was nothing improper about it.

Defendants also claim that the information in the Search Warrant Affidavits is stale. This argument ignores the fully documented two-year pattern of extensive conduct that continued uninterrupted to within less than ten days of the execution of the warrants. There was no reason for the U.S. Magistrate Judge or this Court to believe that the defendants' lifestyle of substantial, continuous illegal activity would suddenly change or that either defendant withdrew from the conspiracy. Longer time lags between incidents and the issuance of a search warrant are permitted in the case of "ongoing long-term criminal activity." *United States v. Fama*, 758 F.2d at 838.

---

**5.** Depositing waste paper on the highway is a summary offense under 75 Pa.C.S.A. § 3709. A highway includes any public road up to its boundary lines. 75 Pa.C.S.A. § 102.

■ Defendants additionally claim that the state agents involved in the investigation were "acting outside the scope of their authority" in conducting this investigation and their illegal and unauthorized conduct has tainted this entire investigation and requires suppression of all of the evidence seized. This ignores the hearing testimony that Agent Licklider and other agents in this case were all sworn in and deputized as D.E.A. Agents on January 23, 1992. Moreover, even if he had not been deputized, we can see no reason why Agent Licklider could not take part in this case. Agent Licklider—the Pennsylvania Attorney General's investigator—was investigating money laundering. The Pennsylvania Criminal Code, 18 Pa.C.S.A. § 5111(e)(3), reads in pertinent part:

> (3) In addition to the authority conferred upon the Attorney General by the act of October 15, 1980 (P.L. 950, No. 164), known as the Commonwealth Attorneys Act, the Attorney General shall have the authority to investigate and to institute criminal proceedings for any violation of subsection (a) or any series of related violations involving more than one county of the Commonwealth or involving any county of the Commonwealth and another state. No person charged with a violation of subsection (a) by the Attorney General shall have standing to challenge the authority of the Attorney General to investigate or prosecute the case and, if any such challenge is made, the challenge shall be dismissed and no relief shall be available in the courts of the Commonwealth to the person making the challenge.

Subsection (a) of 18 Pa.C.S.A. § 5111 reads in pertinent part:

> § 5111. Dealing in proceeds of unlawful activities (a) Offense defined—A person commits a felony of the first degree if the person, knowing that the property involved in a financial transaction represents the proceeds of unlawful activity, conducts a financial transaction which involves the proceeds of unlawful activity under any of the following circumstances:

> (1) With the intent to promote the carrying on of the unlawful activity.
> (2) Knowing that the transaction is designed in whole or in part;
>> (i) to conceal or disguise nature, location, source, ownership, or control of the proceeds of unlawful activity; or
>> (ii) to avoid a transaction reporting requirement under state or federal law.

State officers may assist federal officers in the execution of search warrants. 18 U.S.C. § 3105; *United States v. Cox*, 462 F.2d 1293, 1306 (8th Cir.1972), *cert. denied*, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223. Nevertheless, federal law and not state law governs the validity of searches and seizures. *United States v. Rickus*, 737 F.2d 360, 364 (3d Cir.1984).

Accordingly, the supplemental suppression motion will be denied.

### III. ISSUES RAISED AT THE JANUARY 6, 1993 COURT HEARING

At the January 6, 1993 court hearing, defendants claimed that the Search Warrant Affidavits contained "material misstatements on their face" and we permitted them to call and question Trooper Mark George and Agent Licklider, and cross-examine one government witness, I.R.S. Agent Pat Connelly, at the brief hearing. No one else testified and we are satisfied that no such patent misstatements are present and that nothing precludes the application of the *Leon* good faith doctrine. Our other findings are as follows.

■ Agent Licklider did not investigate defendants' activities at First Lehigh Bank until he spoke to bank employees on August 16, 1991. Defendants questioned how Paragraph 147 of the Connelly–Licklider Affidavit could refer to the use of a drug sniffing dog at that bank prior to that date. Agent Licklider testified that a drug sniffing dog was used to check cash deposits made by defendants on money deposit dates ranging from July 23, 1991 to December 6, 1991. The bank was suspicious and had set aside the previous cash deposits for the officers' use. This is consistent with

the Affidavit and no other reading makes sense because the sniffing could not have taken place before that part of the investigation began.

■ An issue was informally raised about a number of photographs shown by Agent Licklider to Mary Anne Brunnell, a Branch Manager for First Lehigh Bank. Defendant Martinson was using the bank under the name of Clement Potter (Connelly–Licklider Affidavit, ¶¶ 73–83) and the bank furnished standard surveillance photographs of Potter to Agent Licklider, along with a copy of Potter's photo driver's license. These were then made into still-photos which Agent Licklider showed to the bank manager in August, 1991, along with one other photo Agent Licklider had obtained of defendant Martinson from another source. (Connelly–Licklider Affidavit, ¶ 23). Mary Anne Brunnell identified all of the photos as being the same person she had regularly dealt with. Under the circumstances, we do not believe that use of a photo spread was even required. Moreover, any suggestive effect caused by a brief view sixteen months ago of this one non-bank photograph is more than offset by the reliability of the bank's other photos and Mary Anne Brunnell's familiarity with her customer, defendant Martinson. A review of the factors in *Manson v. Brathwaite*, 432 U.S. 98, 114–117, 97 S.Ct. 2243, 2253–54, 53 L.Ed.2d 140 (1977), shows that under a totality of the circumstances there does not exist "a very substantial likelihood of irreparable misidentification."

■ Trooper George testified that the officers knocked and announced they had a search warrant before entering the defendants' residence on Valley Road in New Tripoli. Christine M. Dickson came to the door and let the officers in at which point they arrested her. An immediate, limited rapid sweep was made for the sole purpose of seeing if other persons were present. Both officers were aware of the arrest warrant for defendant Dickson and search warrant which arrived minutes later in the custody of Special Agent Pat Connelly. The officers properly arrested defendant

Dickson since they knew of the warrant. Fed.R.Crim.P. 4(d)(3); *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

■ The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest. *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 1094–95, 108 L.Ed.2d 276 (1989). The actions of the officers are certainly reasonable under the circumstances. "It is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by a warrant." *Dalia v. United States*, 441 U.S. 238, 257, 99 S.Ct. 1682, 1693, 60 L.Ed.2d 177 (1978). Furthermore, as the court said in *United States v. Hepperle*, 810 F.2d 836, 839 (8th Cir.1987), *cert. denied*, 483 U.S. 1025, 107 S.Ct. 3274, 97 L.Ed.2d 772:

> Nothing in the fourth amendment or Rule 41 requires that the search warrant be physically present prior to commencing the search. *Katz v. United States*, 389 U.S. 347, 355 n. 16, 88 S.Ct. 507, 513 n. 16, 19 L.Ed.2d 576 (1967); *United States v. Marx*, 635 F.2d 436, 441 (5th Cir.1981) (failure to deliver copy of search warrant to party whose premises were searched until day after search did not invalidate search in absence of showing of prejudice; violations of Rule 41(d) essentially ministerial in nature); *United States v. McKenzie*, 446 F.2d 949, 954 (6th Cir.1971) (absence showing of prejudice, irregularities in Rule 41(d) procedures do not void an otherwise valid search); *United States v. Woodring*, 444 F.2d 749, 751 (9th Cir.1971) (Rule 41(d) requires officers to serve copy of warrant upon person searched, but does not require that this be done before search commences).

■ In a Supplemental Memorandum filed at the guilty pleas in open court on January 7, 1993, both counsel also maintain that there was no specific information or probable cause for the search of defen-

dants' New Tripoli residence [6] and storage locker # 135. Defendants' residence address is clearly spelled out in Paragraphs 83 and 136 of the Connelly–Licklider Affidavit. We have already pointed out that the phenomenal size and sophisticated nature of defendants' schemes required extensive, daily record-keeping and their lack of employment made it logical to expect to find their true illicit records and other evidence hidden at home or wherever defendants might securely store things. These facts are consistent with and support the opinion in Paragraph 8(g) of the Connelly–Licklider Affidavit:

> That it is common for persons involved in large-scale narcotics trafficking to maintain evidence relating to their obtaining, secreting, transfer, concealment, and/or expenditure of narcotics proceeds, such as: large amounts of currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, money wrappers, and other evidence of financial transactions. These items are maintained by the narcotics traffickers within their residences, their businesses, the residences of relatives and associates, safe deposit boxes, and/or other locations over which they maintain dominion and control over.

An agent's expert opinion is an important factor for a judge to consider in reviewing a search warrant affidavit. *United States v. Fama,* 758 F.2d at 838; *United States v. Foster,* 711 F.2d 871, 878 (9th Cir.1983). In view of the facts and opinion concerning common practices of drug defendants, it is the absence of any reference by defendants to their home address in their dealings that further points to defendants' home as a repository of records, contraband, or other evidence of their crimes.

Indeed, defendants took great pains to shield their true residence by using private mail box drops for their activities with such diverse addresses as: 3650 Nazareth Pike, Bethlehem, PA; 1231 Airport Road, Allentown, PA; 4676 Broadway, Allentown, PA; The Ellipse, Mt. Laurel, NJ; 603 Colonial Avenue, Sterling, VA; and other locations. When specifically asked by a bank employee if he resided in New Tripoli, defendant Martinson denied it and said he lived in Philadelphia. (Connelly–Licklider Affidavit, ¶ 97). The residence was purchased in another's name and reconveyed through a series of transfers to defendant Dickson. (Connelly–Licklider Affidavit, ¶¶ 126–132). All these efforts hampered efforts to locate defendants. (Connelly–Licklider Affidavit, ¶ 142). When defendants lack of jobs or a place of employment is taken into account, their home becomes the focus of a process of elimination.

As notes, a sufficient nexus between the items to be seized and the place to be searched may be established by direct evidence or by inferences. *United States v. McKinney,* 758 F.2d at 1043. In addition, "personal identification and bank records are precisely the sorts of items which people tend to keep at home among their personal papers and effects." *McKinney* 758 F.2d at 1043; *United States v. Maestas,* 546 F.2d 1177, 1180 (5th Cir.1977). As the court said in *United States v. Malin,* 908 F.2d at 165:

> Concededly, Stallard's complaint did not directly link the marijuana to the house. Direct evidence, however, is not necessary to a probable cause determination. *See, e.g., United States v. Angulo-Lopez,* 791 F.2d 1394, 1399 (9th Cir.1986). "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949), *quoted in Gates,* 462 U.S. at 231, 103 S.Ct. at 2328. A judge making a probable cause deter-

---

6. The defendants also cited a lack of probable cause for the search of storage locker # 85 which we have already discussed.

mination "need not determine that the evidence sought is *in fact* on the premises to be searched ... or that the evidence is more likely than not to be found where the search takes place.... [He] need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *United States v. Peacock,* 761 F.2d 1313, 1315 (9th Cir.), *cert. denied,* 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985) (citations omitted) (emphasis in original). In reaching his conclusion, a judge "is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *Angulo–Lopez,* 791 F.2d at 1399. *Accord Rambis,* 686 F.2d at 624. ... To provide probable cause, however, a complaint for a search warrant "need only allege specific facts establishing a reasonable probability that the items sought are likely to be at the location designated; the [complaint] need not also negate every argument that can be asserted against that probability." *United States v. Rambis,* 686 F.2d 620, 623 (7th Cir.1982). *Accord United States v. Fama,* 758 F.2d 834, 838 (2d Cir.1985) ("The fact that an innocent explanation may be consistent with the facts alleged ... does not negate probable cause.")

In *United States v. McKinney,* 758 F.2d at 1044, an agent's opinion, coupled with a common sense inference, was sufficient to establish a nexus between items sought and a building. Taking into account the applicable law, the expert opinions, the sworn facts, and logical inferences, there was a fair probability that false identification documents, money laundering records, and other contraband would be found in the defendants' residence. Furthermore, as we have already discussed, none of the *Leon* exceptions to the good faith rule are present in this case and a reasonably well-trained officer would have believed probable cause was present. All those involved exhibited good faith. We believe that the March 24, 1992 search warrant and search of storage locker # 135, in Whitehall, Pennsylvania are justified under similar principals, however, since the government does

not intend to use anything seized in the search at the criminal trial, we need not address this issue.

An appropriate Order follows.

## ORDER

AND NOW, this 19th day of January, 1993, defendants' Motion for Suppression filed June 5, 1992 and Supplemental Motion for Suppression filed October 6, 1992 are BOTH DENIED.